IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JAHNISHA GORDON, *et al.*,

    Plaintiffs,

v.

ZEROED-IN TECH., LLC, *et al.*,

    Defendants.

Civil No. 23-3284-BAH

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

This case involves a consolidated complaint filed by current and former employees of

Dollar Tree and Family Dollar against Dollar Tree, Inc., Family Dollar, LLC, and Zeroed-In

Technologies following an alleged cyberattack and data breach of Zeroed-In's platform. The

putative class ("Plaintiffs") brought suit against Dollar Tree and Family Dollar (collectively

"Defendants" or "Dollar Defendants") alleging negligence and negligence *per se* (Count II[1]),

breach of implied contract and breach of implied covenant of good faith and fair dealing (Count

III), breach of confidence (Count V), unjust enrichment (Count VII), breach of fiduciary duty

(Count IX), bailment (Count X), and violation of the California Consumer Privacy Act (Count

---

[1] Plaintiffs also brought suit against Zeroed-In alleging negligence and negligence *per se* (Count I), breach of third-party beneficiary contract (Count IV), unjust enrichment (Count VI), and breach of fiduciary duty (Count VIII). *See* ECF 90. Plaintiffs also seek declaratory and injunctive relief against Zeroed-In (Count XII). *Id.* at 108. Zeroed-In filed a motion to dismiss, ECF 96, which will be addressed in a separate memorandum opinion. Dollar Defendants only seek to compel arbitration for the claims brought by Plaintiffs against the Dollar Defendants. Thus, the Court will not address Counts I, IV, VI, VIII, and XII.

XI).[2] ECF 90. Plaintiffs also seek declaratory and injunctive relief against Dollar Defendants (Count XIII). *Id.* at 110. Pending before the Court is Defendants' Motion to Compel Arbitration (the "Motion"). ECF 105. Plaintiffs filed an opposition, ECF 111, and Defendants filed a reply, ECF 119. All filings include memoranda of law and exhibits.[3] The Court has reviewed all relevant filings and finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2023). Accordingly, for the reasons stated below, Defendants' Motion is **GRANTED** in part and **DENIED** in part.

## I.    BACKGROUND

This case arises out of a cyberattack and data breach involving Zeroed-In Technologies, one of Dollar Tree's vendors which maintained certain sensitive employee information. ECF 111, at 9; ECF 105-1, at 12. Plaintiffs allege that the data breach resulted in the theft of current and former employees' confidential personally identifiable information ("PII") stored on Zeroed-In's systems. ECF 111, at 9. On January 19, 2024, the Court granted Plaintiffs' motion to consolidate 11 related proposed class actions.[4] ECF 23. On April 15, 2024, Plaintiffs filed a consolidated class action complaint (the "Complaint") with various counts. ECF 90.

Defendants assert that Dollar Tree and Family Dollar "require all Associates[5] to agree to their Mutual Agreement to Arbitrate Claims." ECF 105-1, at 14 (citing ECF 105-3 (Votta[6] Decl.),

---

[2] Count XI is brought on behalf of Plaintiff Jack Meyers and the putative California class. ECF 90, at 106.

[3] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page.

[4] Several additional cases were transferred and consolidated into the lead case in subsequent months. *See* ECF 62; ECF 88.

[5] Dollar Defendants refer to employees as "associates." The Court will use associates and employees interchangeably.

[6] Vincent Votta is the Manager of Talent Acquisition Operations for Dollar Tree Management, LLC, a subsidiary of Dollar Tree Stores, Inc. ECF 105-3, at 3 ¶ 1.

at 3–4 ¶¶ 2, 7). There are four versions of the Mutual Agreement to Arbitrate that are relevant to this Motion: the February 2016 version ("2016 arbitration agreement"), the July 2019 version ("2019 arbitration agreement"), the August 2020 version ("August 2020 arbitration agreement"), and the October 2020 version ("October 2020 arbitration agreement") (collectively referred to as the "arbitration agreements").[7] ECF 105-3, at 4 ¶ 7. The 2016 arbitration agreement purports to apply to claims "arising out of or related to Associate's employment (or its termination)," ECF 105-3, at 197, while the 2019 and August 2020 versions purport to apply to "all claims . . . whether or not arising out of or related to Associate's application for employment, employment or its termination." ECF 105-3, at 186; ECF 105-3, at 328. The October 2020 version purports to apply to claims "arising out of or related to Associate's application for employment, offer or denial of employment, prospective employment, employment or its termination[.]"[8] ECF 105-3, at 379.

### A.    Online Employment Application

According to Defendants, applicants to Dollar Tree (since July 2019) and applicants to Family Dollar (since March 2020) must agree to arbitration before submitting the online application for employment. ECF 105-3, at 5–6 ¶¶ 8–15; ECF 105-3, at 48–49. The application portal was password protected, and Defendants did not have access to applicants' individual passwords. ECF 105-3, at 5 ¶¶ 9, 10, 11. As part of the online application, "applicants are instructed to click on a hyperlink to 'review Dollar Tree's Mutual Agreement to Arbitrate Claims

---

[7] When discussing the Mutual Agreement to Arbitrate generally, or when it is not necessary to distinguish between the separate versions, the Court refers to the Mutual Agreement to Arbitrate as the "arbitration agreement."

[8] As discussed in more detail below, Plaintiffs Adkisson, Barnett, Cooke, Cox, DeShon, Hasenei, Ingram, Jacobson, McDaniel, Mintz, Player, A. Rivera, Garland, Jeffries, Matczak, McNanna, Sinnett, and C. Rivera agreed to the October 2020 arbitration agreement. Alvarado and D. Garcia agreed to the 2019 arbitration agreement. Eady and S. Garcia agreed to the 2016 arbitration agreement. Brantley and Moss are allegedly bound by the 2019 arbitration agreement, but for the reasons discussed below, cannot be compelled to arbitration at this time.

and the Arbitration Program FAQs.'" *Id.* at 6 ¶ 13 (citing ECF 105-3, at 47–48). The hyperlink is "connected to Dollar Tree and Family Dollar's Arbitration website (https://www.dtarbitration.com/)." *Id.* (citing ECF 105-3, at 50–51). The homepage of the arbitration website states in bold, **"Agreeing to arbitration is a condition of applying to, being hired by, and/or continuing to be employed by Dollar Tree or Family Dollar."** *Id.* ¶ 14 (citing ECF 105-3, at 50). Vincent Votta, a Dollar Tree Manager, also affirms that "the website's homepage explains that it contains 'important information about the Company's arbitration program' and directs applicants to review the 'Arbitration Agreements' page to review the applicable Arbitration Agreement." *Id.* ¶ 13 (citing ECF 105-3, at 50). All versions of the arbitration agreement are available on this website, and the website also contains a set of Arbitration Program Frequently Asked Questions ("FAQs"), which "summarizes certain terms of the Arbitration and the arbitration process." *Id.* Applicants are instructed to "select the appropriate agreement depending on whether the applicant is applying to work for Dollar Tree or Family Dollar and when they applied for employment." *Id.* (citing ECF 105-3, at 50–51). Before submitting the application, applicants must click "I agree" to agree that the applicant had "received and read the Mutual Agreement to Arbitrate Claims, and I agree to its terms." *Id.* ¶ 14.

## B. Onboarding Process

Dollar Tree, as of February 2017, and Family Dollar, as of March 2020, manage onboarding of employees through a secure and confidential website called Dollar Tree Onboarding ("DTO"). ECF 105-3, at 7 ¶ 17. Employees access DTO remotely or in person at their work location. *Id.* For remote onboarders, a secure link to the DTO portal is sent to the personal email address provided by the employee during the application process. *Id.* ¶ 18. According to Defendants, this secure link is "only systemically accessible outside the Dollar Tree or Family Dollar network." *Id.* The onboarding paperwork, which includes the arbitration agreement and

arbitration program FAQs, can be reviewed on any mobile device or computer from any location outside of the Dollar Tree and Family Dollar internet networks. *Id.* ¶ 19.

When an associate completes onboarding in person, a manager signs into DTO and selects the new associate's name. *Id.* at 7–8 ¶ 20. DTO then "instructs the manager to hand the computer or keyboard to the [a]ssociate." *Id.* Defendants maintain that associates must answer certain security questions before accessing the various onboarding forms, *id.* at 8 ¶ 22, and that associates "must clear the Security Challenge by answering the questions they had initially chosen for their electronic signature to appear on [the] [a]rbitration [a]greement and other onboarding documents." *Id.* ¶ 22.

Associates must review and complete the arbitration agreement during the onboarding process by making a language selection, clicking "preview form," and then viewing the arbitration agreement in a new web browser window or tab. *Id.* at 8–9 ¶ 23. After viewing the arbitration agreement, associates must affirmatively check an acknowledgment box confirming the following: "I acknowledge that I have received and read the Mutual Agreement to Arbitrate Claims, and I agree to its terms." *Id.* at 9 ¶¶ 23, 24. Associates cannot affirmatively check the acknowledgment box without first previewing the arbitration agreement in the separate web browser window or tab. *Id.* ¶ 23. The arbitration agreement is also accompanied by the FAQ document. *Id.* ¶ 24. Upon submitting the form to Dollar Tree, the system records a digital signature onto the arbitration agreement, which Dollar Tree maintains in an electronic database. *Id.* ¶ 26.

Prior to March 2020, Family Dollar used an electronic onboarding system called Taleo. ECF 105-3, at 9 ¶ 27. Taleo required a confidential password to access the system, which was created by new associates. *Id.* After an associate created a username and confidential password, they could then sign into Taleo to access and sign their onboarding paperwork, including the

arbitration agreement. *Id.* at 10 ¶ 28. Upon accessing Taleo, associates were prompted to click a link titled "Open Door & Arbitration," which directed them to a screen that read, in part: "The next step in the process involves your review of the Open Door Guidelines and your electronically signing the Mutual Agreement to Arbitrate Claims. Would you prefer to view these documents in English or Spanish?" *Id.* ¶ 29. After clicking through an electronic letter that informed the associate of the binding arbitration agreement, associates were then provided with an electronic version of the "Mutual Agreement to Arbitrate Claims." *Id.* at 11 ¶ 32. If an associate did not click "Continue," they could not continue with the process. *Id.*

While still logged into the Taleo system under their own unique username and password, the new associate was required to review the arbitration agreement. *Id.* ¶ 33. Associates electronically signed the arbitration agreement by entering the last four digits of their social security number in the box provided for their electronic signature, immediately below a capitalized and bolded sentence that read,

> **BY SIGNING BELOW, I ACKNOWLEDGE THAT I HAVE CAREFULLY READ AND UNDERSTAND THIS AGREEMENT AND AGREE TO ITS TERMS. I AGREE THAT THROUGH THIS AGREEMENT, THE COMPANY AND I ARE GIVING UP OUR RIGHTS TO A JURY TRIAL AND THAT PURSUANT TO THE TERMS OF THIS AGREEMENT, WE ARE AGREEING TO ARBITRATE DISPUTES COVERED BY THIS AGREEMENT.**

*Id.* Associates could only click the "continue" button once they had agreed to the arbitration agreement. *Id.* Associates were then asked to confirm a personal email address to receive a copy of the signed arbitration agreement. *Id.* ¶ 34. If an associate did not click "Continue," they could not continue with the process and, therefore, they could not start work at Family Dollar. *Id.*

C.    **Notice of Updated Arbitration Agreement**

In October 2020, Defendants updated the arbitration agreement, creating the October 2020 arbitration agreement. ECF 105-1, at 20. Defendants allegedly notified associates of the October

2020 arbitration agreement by: (i) including an announcement on associates' wage statements; (ii) providing notice in each workplace; and (iii) engaging a third party to mail a copy to each associate's home address. *See* ECF 105-8, at 3 ¶¶ 3–6; ECF 105-4, at 3–4 ¶¶ 3–13; ECF 105-5, at 2 ¶¶ 2–4. According to Defendants, employees who were still employed on December 10, 2020, were bound by the updated October 2020 arbitration agreement. ECF 105-1, at 20.

The October 2020 arbitration agreement expressly reserves for the arbitrator "the exclusive authority to resolve any disputes or claims regarding arbitrability or the formation, interpretation, validity, applicability, unconscionability, or enforceability of this Agreement or any provision of this Agreement."[9] The 2016, 2019, and August 2020 arbitration agreements incorporate the JAMS Rules, which reserve the same questions for the arbitrator's determination.[10] Each version of the arbitration agreement expressly waives the right to participate in a class action. *See* ECF 105-1, at 24 (citing the waiver of class and collective actions provisions in each of the four arbitration agreements).[11]

## II.   **LEGAL STANDARD**

### A.   **Fed. R. Civ. P. 56**

This Court treats motions to compel arbitration as motions for summary judgment pursuant to Fed. R. Civ. P. 56. *See, e.g., Cherdak v. ACT, Inc.*, 437 F. Supp. 3d 442, 454 (D. Md. 2020) (holding that "[t]reating a motion to compel arbitration as a motion for summary judgment is

---

[9] The October 2020 arbitration agreement can be found in Exhibits D, K, O, R, DD, GG, MM, OO, RR, UU, ZZ, BBB, EEE, GGG, III, LLL, OOO to the Votta declaration.

[10] The 2016 Arbitration Agreement can be found in Exhibits F, T–U, V, AA, and PPP to the Votta declaration. The 2019 Arbitration Agreement can be found in Exhibits I, M, Y, JJ, and GGG to the Votta declaration. The August 2020 Arbitration Agreement can be found in Exhibit WW to the Votta declaration.

[11] *See* ECF 105-3, at 65 (October 2020 class waiver); ECF 105-3, at 329 (August 2020 class waiver); ECF 105-3, at 93 (2019 class waiver); ECF 105-3, at 198 (2016 class waiver).

proper where the formation or validity of the arbitration agreement is in dispute, . . . or where documents outside the pleadings must be considered" (internal citations omitted)). Under Rule 56(a), the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In this regard, a fact is "material" if it "might affect the outcome of the suit under the governing law[.]" *Anderson*, 477 U.S. at 248. A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* When considering a motion for summary judgment, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in that party's favor. *Id.* at 255 (citation omitted). But the Court may rely only on facts supported in the record. *See Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). The Court may not rely upon unsubstantiated assertions that are provided in the pleadings. *See id.*

### B.    The Federal Arbitration Act

The Federal Arbitration Act ("FAA") "requires courts to enforce covered arbitration [a]greements according to their terms." *Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 178 (2019) (citations omitted). Under Section 2 of the FAA, an arbitration agreement is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract[.]" 9 U.S.C. § 2. The FAA "establishes 'a liberal federal policy favoring arbitration agreements.'" *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 505 (2018) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)).

The FAA permits a party to an arbitration agreement to seek to compel another party to submit claims to arbitration. *See* 9 U.S.C. § 4. In this regard, Section 4 of the FAA provides that a "party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition . . . [a] district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement." *Id.* The statute also provides that, when presented with such a petition, a "court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration . . . is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." *Id.* But, "[i]f the making of the arbitration agreement" is at issue, "the court shall proceed summarily to the trial thereof." *Id.*

The Fourth Circuit has held that the question of "[w]hether a party has agreed to arbitrate an issue is a matter of contract interpretation: 'a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *Levin v. Alms and Assocs., Inc.*, 634 F.3d 260, 266 (4th Cir. 2011) (quoting *Am. Recovery Corp. v. Computerized Thermal Imaging*, 96 F.3d 88, 92 (4th Cir. 1996) (citation omitted)). And so, "where the dispute at issue concerns contract formation, the dispute is generally for courts to decide." *Granite Rock Co. v. Int'l Bhd. Of Teamsters*, 561 U.S. 287, 296 (2010); *see also Berkeley Cnty. Sch. Dist. v. Hub Int'l Ltd.*, 944 F.3d 225, 234 (4th Cir. 2019) (stating that Section 4 of the FAA "requires that the district court—rather than an arbitrator—decide whether the parties have formed an agreement to arbitrate"). But "[a] district court . . . has no choice but to grant a motion to compel arbitration where a valid arbitration agreement exists and the issues in a case fall within its purview." *Adkins v. Lab. Ready, Inc.*, 303 F.3d 496, 500 (4th Cir. 2002) (citing *United States v. Bankers Ins. Co.*, 245 F.3d 315, 319 (4th Cir. 2001)). Thus, the Court "engage[s] in a limited review to ensure that the dispute is arbitrable—

*i.e.*, that a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the substantive scope of that agreement." *Murray v. United Food & Com. Workers Int'l Union*, 289 F.3d 297, 302 (4th Cir. 2002) (citation omitted). However, "when an agreement 'clearly and unmistakably' delegates the threshold issue of arbitrability to the arbitrator, a court must enforce that delegation clause and send that question to arbitration." *Gibbs v. Haynes Invests., LLC*, 967 F.3d 332, 337 (4th Cir. 2020) (quoting *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010)).

## III.    ANALYSIS

Defendants seek to compel arbitration, and to stay this putative class action, because all Plaintiffs, except for Plaintiff Meyers, have allegedly entered into a valid agreement to arbitrate the claims in this case and according to Defendants, any challenges to arbitrability have been delegated to the arbitrator to decide under the relevant arbitration agreements. ECF 105. Plaintiffs counter that they may proceed with this putative class action because: (1) Plaintiffs lacked actual or constructive knowledge of any arbitration agreement contained in their applications for employment; (2) the onboarding arbitration agreements were not validly formed; (3) Plaintiffs never manifested assent to any arbitration agreement by continuing employment; (4) Plaintiffs are exempt from the FAA as associates engaged in interstate commerce; and (5) the arbitration agreements do not cover this dispute or delegate the issue to the arbitrator. ECF 111.

In the Fourth Circuit, a litigant can compel arbitration under the FAA if the litigant can demonstrate "(1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect or refusal of the defendant to arbitrate the dispute." *See Adkins*, 303 F.3d at 500–

01. Plaintiffs contest the second element by denying the existence of a binding contract to arbitrate this dispute.[12]

A careful review of the record shows that 22 of the 24 Plaintiffs entered into arbitration agreements with Dollar Defendants. Further, the plain language of the delegation clause in the October 2020 arbitration agreement, and the incorporation of the JAMS rules by reference in the remaining arbitration agreements, makes clear that Plaintiffs must address threshold issues of arbitrability before the arbitrator.

### A.    Whether an Agreement to Arbitrate Exists

Defendants, as the party seeking to enforce the arbitration agreement, "bear[] the burden of establishing the existence of a binding contract to arbitrate." *Marshall v. Georgetown Mem'l Hosp.*, 112 F.4th 211, 217 (4th Cir. 2024) (citations omitted). "Whether an agreement to arbitrate was formed is . . . a question of ordinary state contract law principles." *Id.* (citation omitted).

A federal court sitting in diversity must apply the law of the state in which the court is located, including the forum state's choice of law rules. *See Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007); *see also Ground Zero Museum Workshop v. Wilson*, 813 F. Supp. 2d 678, 696 (D. Md. 2011) ("When choosing the applicable state substantive law while exercising diversity or supplemental jurisdiction, a federal district court applies the choice of law rules of the forum state." (citing *ITCO Corp. v. Michelin Tire Corp., Commercial Div.*, 722 F.2d 42, 49 n.11 (4th Cir. 1983))).

---

[12] As a threshold matter, the Court finds that the arbitration agreements affect interstate commerce under the third element, so the FAA applies. Dollar Tree and Family Dollar are national retailers, as evidenced by the claims asserted by Plaintiffs who worked in fifteen states. ECF 105-3, at 4; ECF 90, at 16 ¶ 112. These activities constitute "interstate commerce" under the FAA. Neither party disputes that the putative arbitration agreements affect interstate commerce. ECF 111, at 17; ECF 105-1, at 26. Plaintiffs' arguments related to the transportation workers exemption will be discussed separately. *See infra* section III(B).

"Maryland adheres to the doctrine of *lexi loci contractus*, which provides that 'the law of the jurisdiction where the contract was made controls its validity and construction.'" *Phila. Indem. Ins. Co. v. Markel Ins. Co.*, 649 F. Supp. 3d 84, 94 (D. Md. 2023) (citing *Kramer v. Bally's Park Place, Inc.*, 535 A.2d 466 (Md. 1988)). Here, as Defendants explain, "Plaintiffs executed the [a]rbitration [a]greements remotely when they submitted applications for employment, and they executed them again when they onboarded in connection with their employment in the following states: California, Florida, Georgia, Illinois, Maryland, Michigan, Missouri, New Jersey, New York, North Carolina, Ohio, South Carolina, Tennessee, Texas, and Virginia." ECF 105-1, at 28. Therefore, the state law where Plaintiffs lived and worked applies to determine the formation and validity of the arbitration agreements. The parties both apply Maryland law in their briefs and agree that "Maryland's contract formation law is materially the same as the state laws applicable in each state where Plaintiffs worked and therefore putatively formed these contracts with the Defendants." ECF 111, at 19 n.12; *see also* ECF 105-1, at 29. Accordingly, the Court will also apply Maryland law in addressing the claims.

Under Maryland law, an agreement to arbitrate disputes is enforceable only if it is a properly formed contract. *See Noohi v. Toll Bros., Inc.*, 708 F.3d 599, 603–04, 607 (4th Cir. 2013) (citing *Cheek v. United Healthcare of the Mid-Atl., Inc.*, 835 A.2d 656, 661 (Md. 2003)). "Under Maryland law, 'the formation of a contract requires mutual assent (offer and acceptance), an agreement definite in its terms, and sufficient consideration.'" *Spaulding v. Wells Fargo Bank, N.A.*, 714 F.3d 769, 777 (4th Cir. 2013) (quoting *CTI/DC, Inc. v. Selective Ins. Co.*, 392 F.3d 114, 123 (4th Cir. 2004)). Consideration exists if "a performance or a return promise [is] bargained for," and "[a] performance is bargained for if it is sought by the promisor in exchange for his . . . promise and is given by the promisee in exchange for that promise." *Pettiford v. Next*

*Generation Tr. Serv.*, 226 A.3d 15, 27 (Md. 2020) (quoting *Chernick v. Chernick*, 610 A.2d 770, 774 (Md. 1992)).

Defendants assert that a valid contract was formed because Defendants "offered the arbitration agreements by formally presenting arbitration agreements to Plaintiffs (1) during the application process; (2) during onboarding; and (3) for some plaintiffs, during employment" and Defendants "expressed their intent to be bound by these mutual agreements," ECF 105-1, at 29–30 (citations omitted), and Plaintiffs "accepted these offers by affirmatively agreeing to the arbitration agreements during the application process and electronically signing the arbitration agreements during onboarding." ECF 105-1, at 30 (citing ECF 105-2, at 2–5). According to Defendants, "[s]ome Plaintiffs who were current employees during the October 2020 arbitration agreement roll-out agreed to that agreement by continuing to work for Dollar Defendants following notice from Dollar Defendants." *Id.* at 31 (citations omitted). Defendants also maintain that the arbitration agreements were supported by consideration because they contain a mutual promise to arbitrate. *Id.*

1.  16 Plaintiffs Entered into a Binding Arbitration Agreement During the Application Process

The parties do not dispute that the arbitration agreement was only included in the employment application process for applicants who applied to Dollar Tree after July 2019, or to Family Dollar after March 2020. ECF 111–12, at 11; ECF 105-3, at 5. Defendants have produced authenticated evidence that Plaintiffs Adkisson, Barnett, Cox, DeShon, D. Garcia, Hasenei, Ingram, Jacobson, McDaniel, Mintz, A. Rivera, Garland, Jeffries, Matczak, McNanna, and C.

Rivera (collectively the "Application Plaintiffs") electronically signed the arbitration agreement as part of their employment applications.[13]

Each of the 16 applicants filled out an application that contained a hyperlink to the mandatory arbitration agreement.[14]   Records kept by Defendants as part of their regular business operations show that each of these Plaintiffs, during the application process, checked "I agree" to affirm that they had "received and read the Mutual Agreement to Arbitrate Claims" and that they "agree to its terms."   ECF 105-3, at 208–09 (Garland application); *id.* at 292–93 (Jeffries application); *id.* at 310–11 (Matczak application); *id.* at 354–55 (McNanna application); *id.* at 420–21 (Rivera application); *id.* at 59–60 (Adkisson application); *id.* at 98–99 (Barnett application); *id.* at 124–25 (Cox application); *id.* at 142–43 (DeShon application); *id.* at 182–83 (D. Garica application); *id.* at 226–27 (Hasenei application); *id.* at 259–60 (Ingram application[15]); *id.* at 274–75 (Jacobson application); *id.* at 339–40 (McDaniel application); *id.* at 375–76 (Mintz application); *id.* at 402–03 (A. Rivera application).   All of the Application Plaintiffs agreed to the October 2020

---

[13] The Court notes that Plaintiffs Adkisson, Barnett, Cox, DeShon, D. Garcia, Hasenei, Ingram, Jacobson, McDaniel, Mintz, and A. Rivera (collectively "Non-Declarant Plaintiffs") did not provide declarations in Plaintiffs' response in opposition to the Motion.  Thus, the Non-Declarant Plaintiffs did not provide any evidence to dispute that they are bound by the arbitration agreement.

[14] *See* ECF 105-3, at 23 ¶ 90 (Garland, Dollar Tree, April 13, 2023); *id.* at 29 ¶ 116 (Jeffries, Dollar Tree, October 24, 2022); *id.* at 30 ¶ 122 (Matczak, Dollar Tree, November 29, 2022); *id.* at 33 ¶ 135 (McNanna, Dollar Tree, November 9, 2020 and January 18, 2022); *id.* at 38 ¶ 158 (C. Rivera, Family Dollar, January 6, 2021); *id.* at 12 ¶ 35 (Adkisson, Dollar Tree, December 7, 2021); *id.* at 15 ¶ 49 (Barnett, Dollar Tree, November 12, 2022); *id.* at 17 ¶ 60 (Cox, Dollar Tree, August 31, 2022); *id.* at 18 ¶ 66 (DeShon, Dollar Tree, May 17, 2023); *id.* at 21 ¶ 80 (D. Garcia, Dollar Tree, September 9, 2019); *id.* at 24 ¶ 96 (Hasenei, Dollar Tree, October 8, 2021); *id.* at 27 ¶ 107 (Ingram, Dollar Tree, January 9 and January 14, 2021); *id.* at 27–28 ¶ 110 (Jacobson, Dollar Tree, July 27, 2021); *id.* at 32 ¶ 129 (McDaniel, Family Dollar, January 26, 2023 and January 28, 2023); *id.* at 34–35 ¶ 141 (Mintz, Dollar Tree, June 24, 2023); *id.* at 37 ¶ 152 (A. Rivera, Dollar Tree, January 4, 2023).

[15] Ingram had also previously completed an online application for Dollar Tree on Mary 22, 2020, when the 2019 Arbitration Agreement was in effect. *See* ECF 105-3, at 26–27 ¶ 102.

arbitration agreement, except for Plaintiff D. Garcia.[16]  Plaintiff D. Garcia agreed to the 2019 arbitration agreement. *Id.* at 21 ¶ 80.

An arbitration agreement in an employment application is enforceable. *See Adkins*, 303 F.3d at 504–05 (holding that an agreement to arbitrate contained in an employment application is binding and any argument to the contrary has been squarely foreclosed by the Supreme Court (citing *Circuit City Stores v. Adams*, 532 U.S. 105 (2001))).  And electronic signatures are sufficient to demonstrate a party's acceptance of the terms of an agreement with an arbitration provision. *See Miranda Sorto v. Carrols LLC*, Civ. No. DKC-23-2263, 2024 WL 2783906, at *4 (D. Md. May 30, 2024). Moreover, the promise to arbitrate in this case was mutual, which provides sufficient consideration for the contract. *See, e.g., Malamatis v. ATI Holdings, LLC*, Civ. No. ELH-21-2226, 2022 WL 1591406, at *20 (D. Md. May 19, 2022) ("The mutual exchange of promises plainly provides sufficient consideration to render the Arbitration Agreement enforceable."); *Bowers v. WebstaurantStore*, Civ. No. DKC-20-3516, 2021 WL 4864220, at *1 (D. Md. Oct. 19, 2021) ("An arbitration agreement is supported by adequate consideration where both parties agree to be bound by the arbitration process." (citations omitted)).  Specifically, the October 2020 arbitration agreement, which applies to all of the Application Plaintiffs, except for D. Garcia, states: "the Parties agree to resolve by arbitration all claims or controversies arising out of . . . ," and further clarifies that "[b]y entering into this Agreement, *the Parties mutually agree* to waive their right to a trial before a judge or jury in court[.]"  ECF 105-3, at 314 (emphasis

---

[16] *See* ECF 105-3, at 23 ¶ 90 (Garland); *id.* at 29 ¶ 116 (Jeffries); *id.* at 30 ¶ 122 (Matczak); *id.* at 33 ¶ 135 (McNanna); *id.* at 38 ¶ 158 (C. Rivera); *id.* at 12 ¶ 36 (Adkisson); *id.* at 15 ¶ 49 (Barnett); *id.* at 17 ¶ 60 (Cox); *id.* at 18 ¶ 66 (DeShon); *id.* at 24 ¶ 96 (Hasenei); *id.* at 27 ¶ 107 (Ingram); *id.* at 27–28 ¶ 110 (Jacobson); *id.* at 32 ¶ 129 (McDaniel); *id.* at 34–35 ¶ 141 (Mintz); *id.* at 37 ¶ 152 (A. Rivera).

added). Similarly, the 2019 arbitration agreement[17] states: "The Company and Associate are . . . mutually bound by the Agreement," and the parties "mutually agree to waive their right to a trial in court[.]" ECF 105-3, at 186. In the context of employment applications that require a prospective employee to sign an arbitration agreement as part of the application process, the Fourth Circuit has held that "no consideration above and beyond the agreement to be bound by the arbitration process [is] required." *Johnson v. Circuit City Stores*, 148 F.3d 373, 378 (4th Cir. 1998).

Application Plaintiffs do not dispute that they checked the "I agree" box during the employment application process or that their electronic signatures appear on the page.[18] Rather, Plaintiffs argue that the arbitration agreement is not enforceable because no constructive knowledge of the arbitration agreement can be found "where 'the terms are available only if users scroll to a different screen' or 'complete a multiple-step process of clicking non-obvious links.'" ECF 111, at 20 (citing *Naimoli v. Pro-Football, Inc.*, 120 F.4th 380 (4th Cir. 2024) and *Wilson v. Huuuuge, Inc.*, 944 F.3d 1212, 1220 (9th Cir. 2019)).

When asserting the existence of a contract, one "must demonstrate that the person alleged to be bound by the contract (1) had 'reasonable notice of an offer' to enter into the contract and (2) 'manifested' assent to it." *Naimoli*, 120 F.4th at 389 (quoting *Marshall*, 112 F.4th at 218). As to the first element, the crux of the issue is whether Plaintiffs had "reasonable notice" that they were agreeing to arbitrate any claims. "In the internet context, the traditional notice inquiry

---

[17] Plaintiff D. Garcia agreed to the 2019 arbitration agreement. ECF 105-3, at 21 ¶ 80.

[18] Electronic signatures are "attributable to a person if it was the act of the person," which can be shown by "the efficacy of any security procedure applied to determine the person to which the electronic record or electronic signature was attributable." Md. Code Ann., Com. Law § 21-108(a)). Here, Votta affirmed that the application portal was password protected, and Defendants did not have access to applicants' individual passwords. ECF 105-3, at 5 ¶¶ 9, 10, 11.

focuses on 'the design and content of the relevant interface,' and asks whether it would put a 'reasonably prudent user' on notice of a contract on offer and its terms." *Marshall*, 112 F.4th at 218–19 (first quoting *Starke v. SquareTrade Inc.,* 913 F.3d 279, 289 (2d Cir. 2019), then quoting *Foster v. Walmart, Inc.*, 15 F.4th 860, 864 (8th Cir. 2021)). The Fourth Circuit has recognized that this involves a "fact-intensive inquiry" concerning the web-based agreement at issue. *Marshall*, 112 F.4th at 219 n.6 (quoting *Soliman v. Subway Franchisee Advert. Fund Tr., Ltd.*, 999 F.3d 828, 835 (2d Cir. 2021)). The Fourth Circuit has further stressed that, where it concerns web-based agreements, "the duty-to-read principle that is applicable to traditional contracts must take account of the realities of the Internet where readers reasonably do not often scroll down or follow links presented." *Naimoli*, 120 F.4th at 389. In other words, "'the duty to read does not morph into a duty to ferret out contract provisions when they are contained in inconspicuous hyperlinks,' or can be found only by scrolling down through additional screens." *Marshall*, 112 F.4th at 220 (quoting *Starke*, 913 F.3d at 295).

Plaintiffs' primary argument in opposition to the arbitration agreement in the employment application is that "Defendants buried the arbitration agreement in a *non-mandatory* hyperlink at the very bottom of the employment application, which then required Plaintiffs to click *yet another hyperlink* before they could ever actually view the putative 'Mutual Agreement to Arbitrate.'" ECF 111, at 22 (emphasis in original). Plaintiffs maintain that because they were "not required to ever actually click on either, let alone both, of those several hyperlinks before submitting their application, meaning they could apply without ever having viewed, read, understood, or even known the arbitration agreement existed," Plaintiffs did not validly form arbitration agreements. *Id.* at 22–23. Defendants respond that the application "unambiguously instructed Plaintiffs to 'click [the] dtarbitration [hyperlink] and review Dollar Tree's Mutual Agreement to Arbitrate

Claims and the Arbitration Program FAQs.'" ECF 119, at 11–12 (citing ECF 105-3 at 47). Defendants further maintain that "[b]efore submitting an application, Plaintiffs were *required* to click 'I agree' that they had 'received and read the Mutual Agreement to Arbitrate Claims, and I agree to its terms.'" *Id.* at 12 (citing ECF 105-3, at 6 ¶ 14) (emphasis in original); *see also* ECF 105-3, at 47. According to Defendants, Plaintiffs' argument that they could apply without ever viewing, reading, or understanding the arbitration agreement "misses the point" because "Plaintiffs represented to Dollar Defendants in their employment applications that they not only knew about the [a]rbitration [a]greements but also that they affirmatively agreed to the terms." ECF 119, at 12.

The Fourth Circuit recently reiterated that "when a website provides clear and reasonably conspicuous notice that there are contract terms available by scrolling down or clicking a hyperlink, the user is on reasonable notice of those terms even if she never reads them." *Marshall*, 112 F.4th at 220 (citations omitted). In *Marshall*, the Fourth Circuit held that plaintiff was not reasonably put on notice of the arbitration agreement and its terms during the application process because the defendant's statement at the top of its webpage indicating that "this application and application process is subject to arbitration pursuant to the South Carolina Uniform Arbitration Act," merely told the plaintiff that the "application [was] subject to South Carolina arbitration law," but failed to indicate that the application was "subject to contract 'terms and conditions' that [could have been] reviewed and agreed to by scrolling down or clicking a hyperlink." *Id.* at 220–21. The court reasoned that "[t]here was nothing . . . to call [plaintiff's] attention to contract terms further down the webpage, or even to notify her of the existence of such terms." *Id.* at 221.

Here, by contrast, Plaintiffs were explicitly directed to "please click" the hyperlink, which was blue, and stood out against the rest of the black text and the white background on the

application portal. ECF 105-3, at 48; *see also Berman v. Freedom Fin. Network, LLC*, 30 F.4th

849, 857 (9th Cir. 2022) (explaining that "[c]ustomary design elements denoting the existence of

a hyperlink include the use of a contrasting font color (typically blue) and the use of all capital

letters, both of which can alert a user that the particular text differs from other plain text in that it

provides a clickable pathway to another webpage").[19] The text directed Plaintiffs to "review Dollar

Tree's Mutual Agreement to Arbitrate Claims and the Arbitration Programs FAQs." ECF 105-3,

at 48. Directly below those instructions was a statement that read: "I acknowledge that I have

received and read the Mutual Agreement to Arbitrate Claims, and I agree to its terms," with a

corresponding checkbox that was labeled "I agree." *Id.* Unlike in *Marshall*, Plaintiffs were

directed to specific contract terms, accessible by a conspicuous hyperlink, which was located

directly above an acknowledgment that the applicant had "received and read" the arbitration

agreement and agreed to the terms. *Id.* While Plaintiffs were required to navigate to a new page

to view the terms, the webpage was easy to read and navigate, and critically, the homepage of the

website stated in bold text: "**Agreeing to arbitration is a condition of applying to, being hired**

**by, and/or continuing to be employed by Dollar Tree or Family Dollar.**" ECF 105-3, at 50.

The website also directed Plaintiffs to click on the relevant arbitration agreement (which varied

based on date of application or hire) under the "Arbitration Agreements" tab, which could be

accessed on the left under "Important Links" or through the hyperlink in the text itself.[20] Under

---

[19] Failing to adequately denote hyperlinks can lead to failure of the "conspicuousness test." *See Berman*, 30 F.4th at 857. Here, the hyperlink was blue, and while it was not in all capital letters, the preceding words to the link said, "Please click." ECF 105-3, at 48. The Court finds this sufficient to denote the presence of a hyperlink.

[20] Plaintiffs point out that "[n]ot one of the listed links indicates it leads to a document called 'Mutual Agreement to Arbitrate Claims'; instead, the links to the purported arbitration agreements are titled 'DT Applications or Associates September 25, 2020 (80KB PDF),' 'DT Applicants on or after October 26, 2020 (130KB PDF),' 'FD Applicants or Associates September 25, 2020

these circumstances, the Court finds that the employment application conspicuously called attention to the existence of an agreement to arbitrate. *See Dhruva v. CuriosityStream Inc.*, Civ. No. SAG-23-2265, 2023 WL 7647774, at *3 (D. Md. 2023), *rev'd and remanded on other grounds*, ---F. 4th ----, No. 24-1080, 2025 WL 748138 (4th Cir. Mar. 10, 2025) ("Nothing about the website design or layout obscures the conspicuous location of the Terms of Use hyperlink, which, if clicked, reasonably communicates the terms of the agreement."). Plaintiffs' alleged failure to actually click on the hyperlink to view and read the arbitration agreement before clicking "I agree" to its terms was a decision made by Plaintiffs, not a failure to provide sufficient notice by Defendants. *See Holloman v. Circuit City Stores, Inc.*, 894 A.2d 547, 595 (Md. 2006) ("[A] party who signs a contract is presumed to have read and understood its terms and as such will be bound by its execution." (citations omitted)).

The record evidence makes clear that the web agreement was a clickwrap agreement, meaning that the website "required all applicants to click 'I agree' and affirmatively assent to the [a]rbitration [a]greement and its terms before being allowed to proceed with the application process."[21] ECF 119, at 13 (citing ECF 105-3, at 6 ¶¶ 13-15; ECF 105-3, at 48–51) (emphasis

---

(80KB PDF),' and 'FD Applicants on or after October 26, 2020 (130KB PDF).'" ECF 111, at 12–13 (emphasis removed). The Court notes that this statement, to some extent, decontextualizes the actual information available to an applicant on the webpage. While Plaintiffs correctly list the titles of the documents, they fail to acknowledge that directly above the list of documents, the website states: "Below is a list of Dollar Tree (DT) and Family Dollar (FD) Arbitration Agreements for your reference. Please select the appropriate agreement for your company within the date range you applied or were hired." ECF 105-3, at 51. Once an applicant clicked on the relevant arbitration agreement (depending on the relevant date), a PDF download appeared of a document titled "Mutual Agreement to Arbitrate."

[21] Plaintiffs' citation to the Ninth Circuit's decision in *Wilson v. Huuuuge, Inc.*, 944 F.3d 1212 (9th Cir. 2019) is inapplicable to the circumstances here because the agreement at issue in *Wilson* was "unambiguously a browsewrap agreement," which meant the plaintiff "was not required to assent to [defendant's] terms before downloading or using the app—or at any point at all." *Id.* at 1220.

removed).  "A clickwrap agreement differs from a 'browsewrap agreement,' which does not require a user to click a box or button indicating that he or she agrees to certain terms to use the website, but instead attempts to bind the user to hyperlinked terms simply through using the website." *Am. Eagle Motors, LLC v. Copart of Connecticut, Inc.*, No. 22-cv-656, 2023 WL 123503, at *3 (E.D. Va. Jan. 5, 2023) (citation omitted).  Courts uphold "clickwrap so long as it 'reasonably communicate[s]' the existence of the contract terms." *Lyles v. Chegg, Inc.*, Civ. No. RDB-19-3235, 2020 WL 1985043, at *3 (D. Md. Apr. 27, 2020) (quoting *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 76 (2d Cir. 2017) (collecting cases)).  Here, applicants could not move to the next screen unless they clicked the box acknowledging that they read the arbitration agreement and agreed to its terms. ECF 105-3, at 49–50.  The fact that actually clicking on the hyperlink was not mandatory does not change the nature of the clickwrap agreement, which courts have routinely upheld. *See Dhruva v. CuriosityStream Inc.*, ---F. 4th ----, No. 24-1080, 2025 WL 748138, at *4 (4th Cir. Mar. 10, 2025) (finding that "[b]y subscribing to [a streaming website], [plaintiffs] 'agreed' they had 'read' the hyperlinked terms of use," and thus plaintiffs were "on reasonable notice of those terms even if [they] never read[] them" (quotations and citation omitted)); *George v. Experian Info. Sols.*, No. 23-cv-2303-LKG, 2024 WL 3013146, at *6 (D. Md. June 14, 2024) (explaining that "this Court has upheld internet agreements that require a customer to affirmatively click a box on the website acknowledging receipt of and assent to the contract terms before he or she is allowed to proceed using the website" (internal quotation marks and citations omitted) (collecting cases)); *Zayanderoudi v. Nat'l R.R. Passenger Corp.*, Civ. No. TJS-22-2455, 2023 WL 4744746, at *4 (D. Md. July 25, 2023) (finding that "Plaintiff was required to affirmatively click the box manifesting her assent to the Terms and Conditions . . . and such 'clickwrap' agreements are fully enforceable").

*Naimoli v. Pro-Football, Inc.* does not compel a different result. The district court in *Naimoli* acknowledged that "clickwrap agreements can constitute valid contracts," but found that there was a factual dispute over contract formation in that case because plaintiffs produced record evidence that "upon signing into the WFT/Ticketmaster Website, the pop-up window with the clickwrap agreement initially display[ed] the Ticketmaster Terms of Use, not the WFT Terms & Conditions [which contained the arbitration agreement]." *Naimoli v. Pro-Football, Inc.*, 692 F. Supp. 3d 499, 509 (D. Md. 2023), *rev'd and remanded on other grounds*, 120 F.4th 380 (4th Cir. 2024). The court declined to compel arbitration because "if [plaintiff] moved past the pop-up window by viewing and agreeing only to the Ticketmaster Terms of Use, which do not include the arbitration agreement, he would not have agreed to the WFT Terms & Conditions." *Id.* In short, the holding in *Naimoli* hinged on a factual dispute over whether plaintiffs were ever presented with the document that contained the arbitration agreement. Here, to the contrary, and as established above, Plaintiffs were clearly presented with a hyperlink *labeled* "dtarbitration," which led to a webpage with a tab labeled "Arbitration Agreements," and clicking on the relevant arbitration agreement (according to year) revealed a Mutual Agreement to Arbitrate. ECF 105-3, at 50–51. Accordingly, there is no ambiguity in the instant action over what exactly Plaintiffs were agreeing to in this specific portion of the employment application. The "I agree" box that Plaintiffs clicked in order to move forward in the application process was not couched as an agreement to "Terms of Use" or a "Terms & Conditions" document; rather, the "I agree" box unequivocally asked the applicant to affirm that the applicant had "received and read the Mutual Agreement to Arbitrate Claims," and "agree[s] to its terms." ECF 105-3, at 47. Thus, given the significant factual differences, *Naimoli* provides little guidance in resolving this case and the Court finds it inapposite.

Additionally, contrary to Plaintiffs' interpretation of the lower court's decision in *Naimoli*, the Court does not read *Naimoli* to stand for the proposition that arbitration is defeated in any instance where the user "could only view the purportedly binding agreement by clicking a separate link to a new page and could also click 'I agree' without [having] ever actually viewed the agreement." ECF 111, at 22. As discussed above, the problem in *Naimoli* was that the document that was hyperlinked in the pop-up clickwrap agreement was *not* the document that contained the arbitration agreement. That issue is not present here, where the hyperlink at issue led the applicant to Dollar Tree's arbitration webpage and the "Arbitration Agreements" tab included all "Mutual Agreements to Arbitrate" by year. *Naimoli* does not require a court to deny a motion to compel arbitration merely because the arbitration agreement was hyperlinked and contained on a separate webpage. *See Montoya v. King.com Ltd.*, No. 23-cv-314, 2024 WL 1680028, at *6 (E.D. Va. Apr. 18, 2024) (finding clickwrap agreement valid and enforceable where the terms of use were conspicuously hyperlinked to give plaintiff constructive notice of the terms she was agreeing to, and clarifying that "[e]ven if [p]laintiff did not elect to read the terms, her manifestation of assent still forms a binding contract").

To the extent Plaintiffs argue that the hyperlink did not route applicants directly to the arbitration agreement, but rather required Plaintiffs to first click on the "Arbitration Agreements" tab and then select the relevant arbitration agreement to download, the Court finds that this does not defeat notice because the hyperlink was conspicuous, and it was sufficiently clear where the arbitration agreements could be found on the website once a user clicked the hyperlink. *See Melo v. Zumper, Inc.*, 439 F. Supp. 3d 683, 697 (E.D. Va. 2020) (explaining that reasonable notice hinges on "whether the website presented the terms and conditions in a hyperlink, and whether that hyperlink appeared clearly to the user" (citation omitted)). Additionally, the Court agrees with

Defendants that regardless of whether Plaintiffs actually clicked the hyperlink before acknowledging that they had read and agreed to the arbitration terms, "Plaintiffs *represented* to Dollar Defendants in their employment applications that they not only knew about the [a]rbitration [a]greements but also that they affirmatively agreed to the terms," which provides additional support for the enforceability of the agreement. ECF 119, at 12 (emphasis added). In light of the above, the Court finds that Plaintiffs had "reasonable notice" of the offer to enter into a binding arbitration agreement. *Naimoli*, 120 F.4th at 389.

Additionally, there is no genuine dispute as to the second element—manifesting assent to the offer—because the Defendants have produced electronic records that reveal each of the Application Plaintiffs checked the "I agree" box, which was a clickwrap agreement, during the employment application process.[22] The Court readily acknowledges that "clicking on a button on a webpage, viewed in the abstract, does not signify a user's agreement to anything." *Marshall*, 112 F.4th at 222 (citing *Berman*, 30 F.4th at 857). However, "[w]hen website buttons have labels denoting assent, like 'I accept' or 'I agree,' a user's click 'can suffice to signify the acceptance of a contract.'" *Id.* (citations omitted); *see also Melo*, 439 F. Supp. 3d at 697 ("[C]ourts have consistently recognized that [an] electronic 'click' can suffice to signify the acceptance of a contract, and that there is nothing automatically offensive about such agreements, as long as the layout and language of the site give the user reasonable notice that a click will manifest assent to an agreement." (quotation marks and citations omitted)).

---

[22] The Court notes that Plaintiffs do not contest that the "I agree" box was a "required field" and that failing to check it prohibited an employee from progressing through the rest of the application. While Plaintiffs contend that they could check the box without actually navigating to the hyperlink, that, as discussed above, does not negate the nature of the clickwrap agreement or Plaintiffs' assent to its terms. *See Montoya*, 2024 WL 1680028, at *6.

Here, the plain text of the application directed Plaintiffs to click the hyperlink to review the arbitration agreement and then stated: "I acknowledge that I have received and read the Mutual Agreement to Arbitrate Claims, and I agree to its terms," with a corresponding "I agree" checkbox directly below that sentence. ECF 105-3, at 47. Thus, Plaintiffs were explicitly advised that the act of clicking the checkbox constituted assent, and the Court is required to give effect to the binding arbitration agreement. *See Campbell v. Comcast Cable Commc'ns Mgmt., LLC*, No. 21-cv-2000-CCB, 2022 WL 4237109, at *5 n.1, *5–6 (D. Md. Sept. 13, 2022), *reconsideration denied*, No. 21-cv-2000-CCB, 2022 WL 17094562 (D. Md. Nov. 18, 2022) (holding that the plaintiff accepted the arbitration agreement where the defendant's labor and employee relations specialist submitted an affidavit stating that someone logged onto the plaintiff's secure company account using his username and password and clicked on the "I Acknowledge" button).

In sum, there is no genuine dispute that Defendants gave Plaintiffs adequate notice of the agreement to arbitrate during the employment application process and Plaintiffs affirmatively assented to the arbitration agreement by checking a box labeled "I agree," which confirmed that Plaintiffs had "received and read the Mutual Agreement to Arbitrate Claims, and [] agree[d] to its terms."[23] ECF 105-3, at 47.

---

[23] Plaintiffs argue that "[c]ourts have denied motions to compel under similar factual circumstances." ECF 111, at 27 (citing *Kabba v. Rent-A-Center, Inc.*, 730 F. App'x 141, 142 (4th Cir. 2018) and *Lorenzo v. Prime Comm'n, L.P.*, 806 F.3d 777, 779 (4th Cir. 2015)). Neither case is on point. *Kabba* involved a genuine factual dispute over whether the parties "agreed to modify the [] agreements at issue to exclude covering any disputes relating to [plaintiff's] 2013 employment." *Kabba*, 730 F. App'x at 143. No such factual dispute exists here. And Plaintiffs' citation to *Lorenzo* is similarly inapposite. There, the employee "signed an acknowledgement form providing that the terms of the Employee Handbook, including its arbitration provision, were 'guidelines only,' that did not create any binding commitments." *Lorenzo*, 806 F.3d at 782. The Fourth Circuit thus held that the "district court correctly recognized that the acknowledgment form that [defendant] drafted and [plaintiff] signed expressly disclaimed any implied agreement to be contractually bound by any terms in the Employee Handbook." *Id.* By contrast, here, there is a binding arbitration agreement.

2.    The Remaining Plaintiffs

It is undisputed that Plaintiffs Cooke, Brantley, S. Garcia, Moss, Player, Eady, and Sinnett are not bound by arbitration agreements in their applications because at the time they applied, the applications did not contain binding arbitration agreements. ECF 105-3, at 5 ¶ 8; ECF 111, at 13. The parties contest whether Plaintiff Alvarado was bound by an alleged employment application, but the Court finds that it need not reach the employment application issue as to Alvarado because there is competent evidence that Alvarado agreed to arbitration during the onboarding process. The Court will first analyze Alvarado's claims before turning to the remaining non-application Plaintiffs.

*i.    Plaintiff Alvarado Must be Compelled to Arbitration*

Defendants produced authenticated evidence that Alvarado first agreed to the arbitration agreement when she completed onboarding on June 15, 2019. *See* ECF 105-3, at 13 ¶ 42 (Votta declaration authenticating onboarding documents); ECF 105-3, at 81 (arbitration agreement with date-and-time stamped electronic signature); ECF 105-3, at 86 (FAQ arbitration document with date-and-time stamped electronic signature). In her affidavit, Alvarado admits that she completed the onboarding process, but asserts that she "did not understand all of the documents that were included in the onboarding materials, but no one was available for [her] to ask questions." ECF 111-7, at 2–3. Alvarado also states that she was "completely unaware" of the arbitration agreement and does not "recall" receiving any signed arbitration agreement to her email. *Id.* at 3. She also indicated that "[i]f an arbitration agreement was included in the onboarding materials that [she] signed, [she] did not understand its terms or that what [she] was signing was an agreement to arbitrate." *Id.*

"[A] party cannot avoid compelled arbitration by generally denying the facts upon which the right to arbitration rests; instead, the party must identify specific evidence demonstrating a material factual dispute." *S. Elec. Servs. Inc. v. Cornerstone Detentions Prods., Inc.*, No. 10-cv-00076, 2010 WL 2233664, at *3 (W.D. Va. June 3, 2010) (citing *Tinder v. Pinkerton Sec.*, 305 F.3d 728, 735 (7th Cir. 2002)). And typically, "'I don't recall[]' [is] insufficient as a matter of law to create a material issue of fact." *Soucie v. Va. Util. Protection Serv., Inc.*, No. 22-cv-00552, 2023 WL 2991487, at *6 (W.D. Va. Apr. 18, 2023). In *Soucie*, the plaintiff asserted that she "'[did] not recall' clicking on the 'Mark as Read' button, [did] not remember having ever seen or acknowledged the [a]greement, and [did] not recall anyone explaining it to her." *Id.* at *2. The plaintiff further alleged that she did not have a copy of the agreement and had "no recollection of anyone telling her that she had to assent to the [a]greement as a condition of her continued employment." *Id.* The court found that there was no genuine dispute of material fact over whether plaintiff clicked "Mark as Read" because plaintiff "simply [stood] on her 'I do not recall' answers, offering no unequivocal denial and no alternative explanation for [defendant's] overwhelming proof that she clicked 'Mark as Read.'" *Id.* at *6.

Here, as in *Soucie*, Defendants have produced "abundant digital evidence," *id.*, that Alvarado entered into an arbitration agreement, while Alvarado merely asserts that she does not recall receiving such an agreement, and if she signed one, she did not understand the terms. ECF 111-7, at 2–3. But a plaintiff cannot merely claim lack of understanding after the fact to negate the validity of a contract. As Judge Chasanow explained, "Plaintiff[] had the opportunity to read the documents, if [she] wished, and to defer signing . . . [a]bsent fraud, any failure by Plaintiff[] to obtain information to understand the transaction, due to [her] own negligence, does not undermine the validity of the contract." *Bowers*, 2021 WL 4864220, at *1; *see also Padro v. Citibank, N.A.*,

No. 14-cv-2986, 2015 WL 1802132, at *5 (E.D.N.Y. Apr. 20, 2015) ("[I]t is not relevant, for purposes of [a motion to compel arbitration], whether Plaintiff recalls signing documents acknowledging the Employment Arbitration Policy, or whether she subjectively understood at the time the contents thereof."). Thus, even viewing the evidence in the light most favorable to Alvarado, her affidavit is insufficient to create a genuine dispute of material fact over contract formation. The Court finds that authenticated digital evidence shows that Alvarado assented to the arbitration agreement during the onboarding process and there was a mutual promise to arbitrate, thus providing sufficient consideration. Accordingly, the arbitration agreement is valid and enforceable as to Alvarado.[24]

> ii.   *There is No Genuine Dispute of Fact over the Alleged Notice Provided to Plaintiffs Cooke, Player, and Sinnett.*

Plaintiffs aver that "there are no signed agreements for at least two plaintiffs: Danielle Cooke and Rosie Player," and therefore there is no evidence that they "manifested assent to be bound by an arbitration contract." ECF 111, at 20. Defendants argue that "Player and Sinnett [] agreed to arbitration . . . when they continued employment after receiving notice of the October 2020 Arbitration Agreement." ECF 119, at 14. Defendants also argue that Plaintiff Cooke agreed to arbitration through written notice and continued employment following that notice. ECF 105-2, at 2. According to Defendants, in October 2020, Defendants updated the arbitration agreement, creating the October 2020 arbitration agreement. ECF 105-1, at 20. Defendants allegedly notified employees of the October 2020 arbitration agreement by: (i) including an announcement on

---

[24] Votta affirms that Alvarado assented to arbitration a second time when she applied to work for Dollar Tree on October 5, 2019, after her prior period of employment ended on August 23, 2019. ECF 105-3, at 13–14 ¶¶ 43, 44. Because the Court finds that Alvarado entered into a valid and enforceable arbitration agreement during her June 15, 2019, onboarding process, the Court need not reach the argument that she agreed to arbitration a second time.

associates' wage statements; (ii) providing notice in each workplace; and (iii) engaging a third party to mail a copy to each associate's home address. *Id.* (citations omitted). As such, according to Defendants, "employees who were still employed on December 10, 2020, were bound by the updated October 2020 [a]rbitration [a]greement." *Id.*

As an initial matter, the Court is unpersuaded that the notice on the bottom of the pay stubs constituted notice. This purported "notice" is a statement on the bottom of Plaintiffs' pay stubs indicating, "New arbitration agreement applies to associates employed on December 10, 2020." *See, e.g.*, ECF 105-8, at 5. Defendants produce the paystubs[25] but provide no evidence that Plaintiffs Player, Cooke, or Sinnett ever actually viewed the paystubs. Player affirms in her affidavit that "there was no express requirement that [Player] open or acknowledge [her] paystubs," and "[b]ecause [she] never looked at [her] paystubs [during the relevant time period], [she] do[es] not recall every seeing the 2020 update of the arbitration terms." ECF 111-3, at 3–4 ¶ 19. Accordingly, there is a question of fact over whether Plaintiffs Player, Cooke, and Sinnett received notice via paystubs.

Similarly, there is no direct evidence that Plaintiffs Player or Sinnett ever saw the notice allegedly posted in the breakroom at their places of employment.[26] The fact that Defendants

---

[25] *See* ECF 105-8, at 5, 13, 17.

[26] Defendants do not even attempt to argue that Cooke received notice via the breakroom flyer. *See* ECF 119, at 9 n.3 (asserting that Cooke agreed to be bound by the October 2020 arbitration agreement after "receiving the agreement in the mail, and receiving notice on her wage statements and through Dollar Tree's intranet, Aisles"). Travis McNail, the current Vice President of Human Resources, affirmed that Dollar Tree used a platform called Aisles and the October 2020 update to the arbitration agreement was announced on Aisles, ECF 105-6, at 2–3, but the Court finds this insufficient to compel Cooke to arbitration. While McNail asserts that Cooke "had access to and would have been using Aisles on a regular basis as part of her job duties," McNail fails to provide any additional information from which the Court could infer Cooke had actual or constructive notice of the October 2020 updated arbitration agreement. While Aisles was allegedly "required to be used" by all associates, there is no information about how or whether that was enforced and

produced evidence that managers had printed the arbitration update notice and posted it in the respective break rooms does not provide specific evidence that Plaintiffs Player or Sinnett ever saw the notice. *See* ECF 105-4, at 3–4. Additionally, the affidavit of Matthew Broel[27] contains no information regarding whether all associates used the breakroom, where the notice was posted in the breakroom, or whether the specific Plaintiffs at issue regularly used the breakroom.

The question remains, however, whether Plaintiffs Cooke, Player, and Sinnett agreed to the October 2020 arbitration agreement by allegedly receiving notice by mail of the arbitration agreement and continuing their employment after receiving such notice. Plaintiffs argue that the notice provided was insufficient because "[f]or Plaintiffs' continued employment to amount to assent to be bound by Defendants' October 2020 [a]rbitration [a]greement, Plaintiffs *had to have knowledge of that agreement* and of the fact that *their continued employment amounted to assent* to that agreement," and here, "both elements are absent." ECF 111, at 25 (emphasis in original). Defendants respond that they have sufficiently "demonstrated that the [a]rbitration [a]greement mailer was properly addressed, stamped, and mailed to Player and Sinnett," and "[n]either Player nor Sinnett offer specific evidence to deny receipt." ECF 119, at 15. Thus, according to Defendants, "evidence on the successful mailing alone is enough to find an enforceable agreement to arbitrate." *Id.*

It appears that neither party contests the general principle that continued employment can constitute assent under Maryland law, so long as both parties have actual or constructive

---

how frequently associates had to check Aisles. *Id.* at 3. McNail further provides no evidence that Cooke actually logged into Aisles or otherwise received notice of the arbitration update via Aisles. In the absence of additional evidence, the vague assertion that Cooke "had access to and would have been using Aisles" is insufficient to provide notice.

[27] Matthew Broel is the Director of Operations Project Program Management for Dollar Tree Stores, Inc., a subsidiary of Dollar Tree, Inc. ECF 105-4, at 2 ¶ 1.

knowledge of the agreement and the fact that continued employment amounts to assent.[28] *See* ECF 111, at 25; ECF 119, at 14–15.  Indeed, multiple courts have recognized this principle.  *See Rakowski v. Best Buy Stores, L.P.*, Civ. No. ELH-20-1107, 2020 WL 6485085, at *10 (D. Md. Nov. 3, 2020) ("It is generally recognized that continued employment can constitute acceptance of a contract, including an agreement to arbitrate, when such employment is conditioned on acceptance of the contract." (citations and quotation marks omitted)); *Miranda Sorto*, 2024 WL 2783906, at *5 ("[C]ourts have held that when an employment contract is conditioned upon the employee's acceptance of an arbitration agreement, continued employment can constitute assent even when the employee did not sign the arbitration agreement.").  The dispute here thus appears to hinge on whether Plaintiffs Player, Sinnett, and Cooke were given sufficient notice that continued employment constituted assent to the updated October 2020 arbitration agreement if an associate remained employed on December 10, 2020.

Plaintiffs aver that "Defendants fail to present sufficient facts to demonstrate [the] Plaintiffs . . . ever received written notice of the October 2020 agreement . . . by mail[.]"  ECF 111, at 25.  But the record evidence shows that Defendants engaged Toppan Merrill, a third-party mailer, to send the arbitration agreements to each employee's home address.  ECF 105-5, at 2.  Ronald DiBianca[29] affirms that "Dollar Tree asked Toppan Merrill to prepare and send arbitration agreement mailers, in English and Spanish, to over 208,935 people." *Id.* ¶ 2.  Dollar Tree provided Toppan Merrill with the names and last known addresses of 208,935 individuals, and Toppan

---

[28] Additionally, arbitration agreements do not have to be signed to be enforceable.  *See Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 416 (4th Cir. 2000) ("[A] party can agree to submit to arbitration by means other than personally signing a contract containing an arbitration clause.").

[29] Ronald DiBianca is employed by Toppan Merrill as its Mail Production Manager.  ECF 105-5, at 2 ¶ 1.

Merrill then "conducted a National Change of Address (NCOA) search and updated the addresses for those individuals based on the most up-to-date USPS database available for the supplied names and addresses." *Id.* ¶ 3. DiBianca affirms that on October 23, 2020, he "caused the arbitration agreement mailers to be mailed via USPS first class mail, postage prepaid, to everyone on Exhibit B." *Id.* ¶ 4. Exhibit B shows that the arbitration agreements were mailed to Plaintiffs Player, Sinnett, and Cooke. ECF 105-5, at 31–34. Additionally, the memorandum attached to the arbitration agreement, which was allegedly mailed to Plaintiffs, states in bold text on the first page: **"If you are employed by the Company on December 10, 2020, you will be bound by the new Arbitration Agreement, without any further action on your part. There is no need to sign the new Agreement."** *Id.* at 4. The second page of the mailer, titled "Dollar Tree/Family Dollar Arbitration Program: Frequently Asked Questions," includes the same language, but underlined instead of bolded. *Id.* at 5. DiBianca asserts that between October 26 and December 23, 2020, 13,643 of the arbitration mailers were returned to Toppan Merrill "due to the addressee either no longer residing at the mailing address or refusing to accept and requesting a return of the mailer." *Id.* at 2 ¶ 5.

Plaintiffs assert that "Defendants do not specify whether mailers addressed to Plaintiffs were among those thousands not delivered or include any exhibit verifying otherwise." ECF 111, at 25 (citation omitted). Defendants respond that "[a] review of Exhibit C [to the DiBianca Affidavit] confirms that the mailers of Player and Sinnett were not returned."[30] ECF 119, at 15 n.10.

---

[30] It appears Exhibit C was not initially attached to the DiBianca affidavit in Defendants' Motion.

On March 17, 2025, the Court issued a letter order directing Defendants to provide the Court with an unredacted copy of Exhibit C to the DiBianca affidavit.[31]  ECF 120.  The next day, Defendants provided the requested document.  ECF 121; ECF 122.  The Court reviewed Exhibit C and finds that the mailers addressed to Plaintiffs Player, Sinnett, and Cooke were not returned. ECF 122.

Additionally, in their declarations, Player and Sinnett do not attest that they never received an arbitration agreement in the mail.[32]  According to Plaintiffs' brief, "[Player and Sinnett] *do not recall* receiving [the notices]."  ECF 111, at 25 n.18 (citing ECF 111-3, at 3 ¶ 9-12; ECF 111-5, at 4 ¶¶ 19, 20) (emphasis added).  However, a review of the declarations Plaintiffs cite reveals that Sinnett merely asserts that she "did not . . . receive the [a]greement at any time throughout [her] employment with Family Dollar."  ECF 111-5, at 4 ¶ 19.  And Player similarly states that she "did not . . . receive the arbitration agreement . . . at any time throughout [her] nearly sixteen years of employment with Dollar Tree."  ECF 111-3, at 3 ¶ 11.  These general statements do not directly address the mailers that were allegedly sent out in October 2020 or rebut Defendants' evidence that the mailers were delivered.  *Cf. Hamilton v. Fam. Dollar Stores of Missouri, LLC*, No. 22-cv-00028, 2022 WL 2345755, at *6 (W.D. Mo. June 29, 2022) (finding that plaintiff "raises [] a question of fact whether Family Dollar can show adequate offer and acceptance of the 2020 [a]rbitration [a]greement" where plaintiff specifically attested she "never received an arbitration agreement from Family Dollar or anyone else in the mail and never viewed her electronic pay-stubs" and defendant "present[ed] no direct evidence to establish otherwise").  Unlike in *Hamilton*, no specific denial of receipt is present here.

---

[31] Defendants also provided a redacted copy to Plaintiffs.  ECF 123.

[32] Cooke did not provide a declaration.

In any event, as already established, a mere assertion that a party does not recall something is insufficient to create a genuine dispute of material fact. Under Maryland law, "where [a party] has submitted an affidavit showing that the [notice] was properly mailed, [the opposing party] bears the burden of rebutting the presumption that he received the [notice] through specific evidence beyond his own denial of receipt." *Alston v. Barclays Bank Del.*, Civ. No. TDC-18-2829, 2019 WL 13487572, *1 (D. Md. Apr. 16, 2019). In their declarations, Plaintiffs Player and Sinnett do not even directly address Defendants' assertion that the notices were mailed to their home addresses, but even if they did, they have provided no evidence beyond general denial of receipt. Thus, the Court is satisfied that there is no genuine dispute of fact. Defendants have provided competent evidence that the notices were mailed to Player, Sinnett, and Cooke, and none of those three mailers were returned. ECF 105-5, at 31–34; ECF 122. As such, because the notice explicitly stated that employees still employed by the Company on December 10, 2020 "will be bound by the new [a]rbitration [a]greement," ECF 105-5, at 4, Plaintiffs knew or should have known that their continued employment constituted assent to the arbitration agreement. The notice further clarified that if an employe "ceases working for the Company before December 10, 2020, [the employee] will not be subject to the new [a]rbitration [a]greement." *Id.* Because Plaintiffs Player, Sinnett, and Cooke remained employed after receiving notice that continued employment would constitute assent to the arbitration agreement, they are bound by the October 2020 agreement.[33] *See, e.g., O'Neil v. Hilton Head Hosp.*, 115 F.3d 272, 275 (4th Cir. 1997) (upholding the

---

[33] Because the Court finds that Plaintiff Player entered into a valid agreement to arbitrate through notice and continued employment, the Court declines to address Defendants' alternative argument that Player agreed to an earlier version of an arbitration agreement by declining to opt out by May 31, 2015. ECF 119, at 13–14.

enforceability of an arbitration agreement that included language conditioning employment on agreeing to arbitration).

> iii.    *There is a Genuine Dispute of Fact over Whether Plaintiffs Brantley and Moss Entered into a Binding Arbitration Agreement during the Onboarding Process.*

Plaintiffs Brantley and Moss have demonstrated a genuine dispute of material fact over whether they entered into a valid arbitration agreement.[34]    Another trial court in this Circuit evaluated whether plaintiffs can be compelled to arbitration when they have submitted declarations alleging that their "supervisors often filled out electronic forms for them." *Gordon v. TBC Retail Grp., Inc.*, No. 14-cv-3365, 2016 WL 4247738, at *7 (D.S.C. Aug. 11, 2016).    The court found that viewing the evidence in the light most favorable to plaintiffs, there was sufficient evidence to create a genuine dispute of fact "as to whether it was the [] plaintiffs or their manager who signed the [a]greement." *Id.*

Similarly, in *Hazlett v. Family Dollar Stores of Tennessee, Inc*, the court found that there was a material factual dispute as to whether there was mutual assent to the terms of an arbitration agreement allegedly signed by plaintiff during the onboarding process because plaintiff submitted a declaration alleging that the "store manager [] maintained control over the computer mouse at all times during her onboarding process, scrolled rapidly through documents displayed on the screen in quick succession, pausing long enough only to have the plaintiff enter the last four digits of her social security number a couple of times but without explaining to the plaintiff what she was signing or even that she was signing a contract." No. 20-cv-804, 2021 WL 663665, at *7

---

[34] Defendants do not argue that Brantley and Moss are bound by written notice of the 2020 arbitration agreement and continued employment. Rather, according to Defendants, Brantley and Moss are bound only by their in-person onboarding processes. *See* ECF 105-2, at 2 (indicating that Brantley is bound by onboarding process alone); *id.* at 4 (indicating that Moss is bound by onboarding process alone).

(M.D. Tenn. Feb. 19, 2021). In denying the motion to compel arbitration, the court found that "plaintiff's [d]eclaration, if true, shows that she had no reason [] to know that she was signing an arbitration agreement." *Id.*; *see also Roberts-Banks v. Fam. Dollar of Tenn., Inc.*, No. 19-cv-10, 2019 WL 5075832, at *3 (E.D. Tenn. Oct. 9, 2019) (denying motion to compel arbitration where a genuine dispute of material fact arose from plaintiff's allegations that plaintiff's supervisor "did the first part of the training under [plaintiff's] name, including the Arbitration module").

Here, the allegations are similar to those in *Hazlett* and *Roberts-Banks*, and the question of assent to the arbitration agreement turns on a credibility determination. Plaintiff Moss alleges that the store manager "controlled the computer mouse" during the onboarding process, scrolled through documents displayed on the screen, occasionally "asked [Moss] to dictate [] personal information[,] typed in that information, and then appeared to sign the documents for [Moss]." ECF 111-8, at 3. Moss further affirms that he was "unaware of the contents of the documents," including those which the store manager "completed with [Moss's] information and/or signature," and was "unaware of any arbitration agreement between [Defendants] and [Moss]." *Id.* at 4. Plaintiff Brantley similarly alleges that the store manager directed her "where to scroll to sign the document that [the store manager] wanted [her] to sign." ECF 111-10, at 3. Brantley was "instructed by [the store manager] to 'sign this' when directing [Brantley] to the place on the document where she wanted [her] to sign." *Id.* As a result, Brantley "did not have the opportunity to read the words, terms, or conditions on the documents that [she] was instructed to sign." *Id.* Thus, just as in *Hazlett*, where the defendant produced records that plaintiffs' electronic signatures are affixed to the arbitration agreement, but the plaintiffs' declarations "[gave] rise to a question of fact as to whether [they] actually had the opportunity to read or review any part of the Arbitration Agreement before being asked to sign it electronically," this Court is constrained to conclude that

there is a material factual dispute over whether Plaintiffs Brantley and Moss had notice they were signing an arbitration agreement during the onboarding process, and therefore, whether a valid contract was formed. *Hazlett*, 2021 WL 663665, at *7.

Defendants argue that "neither *Hazlett* nor *Roberts-Banks* is controlling authority here," and regardless, the cases are distinguishable because "Plaintiffs here 'do[] not allege that [their] store managers assisting new hires could access Taleo without using the new hire's username or password. Instead, the uncontroverted evidence before this Court indicates that only Plaintiff[s] could access Taleo with a self-selected username and password that Defendant did not know.'" ECF 119, at 18 (citing *Moncada v. DHI Mortg. Co., Ltd.*, 714 F. Supp. 3d 645, 652 (D.S.C. 2023) (emphasis removed)). The Court is not persuaded by the reasoning in *Moncada*, as it presents some key factual differences from the situations faced by Plaintiffs Brantley and Moss.[35] Here, both Brantley and Moss have specifically alleged the supervisor either controlled the mouse or directed where to move the mouse, scrolled through the documents quickly, and paused long enough only for Plaintiffs to enter their signatures, initials, or last four digits of their social security numbers. Thus, the fact that Plaintiffs could only access Taleo with a self-selected username and password, does not, in this Court's view, defeat the material factual dispute over who *controlled* the onboarding process and whether Plaintiffs knew what information was contained in the

---

[35] The plaintiff in *Moncada* appears to have alleged that he "did not complete an electronically signed Mutual Arbitration Agreement on April 8, 2021," and that he "did not have access to a computer on April 8, 2021." 714 F. Supp. 3d at 648 (citation omitted). He also asserted that his supervisor "did not discuss an arbitration agreement with him and that he never clicked on, s[c]rolled through, signed or read the Mutual Arbitration Agreement." *Id.* (quotation marks and citation omitted). According to plaintiff, "[a]lthough the Mutual Arbitration Agreement ha[d] [his] name typed above the line stating 'Employee Signature,' he did not electronically sign that document, and did not print [his] name on that form." *Id.* (quotation marks and citation omitted). The Court finds the allegations at issue in the instant case to be more specific and problematic than the general allegations seemingly at issue in *Moncada*.

documents they signed. Because the extent to which Plaintiffs Brantley and Moss were able to review the documents is genuinely disputed by record evidence from the parties, the Court cannot conclude that a valid contract was formed as to these two Plaintiffs.

> iv.    *Plaintiff S. Garcia and Plaintiff Eady Must be Compelled to Arbitration*

Plaintiff S. Garcia submitted a similar affidavit to those submitted by Plaintiffs Brantley and Moss, alleging that the store manager "maintained control over the computer mouse for the entirety of th[e] [onboarding] process." ECF 111-11, at 3 ¶ 18. However, Defendants argue that S. Garcia remotely onboarded through DTO and "DTO is accessed through a secure link that was only emailed to S. Garcia's personal email address." ECF 119, at 18 (citation omitted). According to Defendants, "[b]ecause this link was only accessible through a device connected outside the Dollar Tree network, S. Garcia could not have signed the [a]rbitration [a]greement in a store, and her allegations of rushed onboarding or managers that controlled the process are, necessarily, inaccurate and proven false." *Id.*

Defendants produced authenticated evidence that S. Garcia onboarded through DTO on May 14, 2019. ECF 105-3, at 22 ¶ 86. Votta affirmed that "[t]o gain remote access to DTO, new Associates are sent a system-generated email to the personal email address they provided to Dollar Tree with their application." ECF 119-2, at 3 ¶ 5. The email "includes a secure link to DTO Associate Portal," and "is only systemically accessible outside the Dollar Tree network." *Id.* S. Garcia signed her onboarding paperwork, including the arbitration agreement, "while connected to a mobile device or computer from a location outside of the Dollar Tree network." *Id.* ¶ 6. According to Votta, "[t]he only way she could have accessed these documents was through the link to the confidential DTO portal, which was only sent to the email address provided by her." *Id.*

38

Accordingly, the Court finds that there is no genuine dispute of material fact over whether S. Garcia agreed to arbitration during the onboarding process. Defendants have produced overwhelming digital evidence that S. Garcia onboarded remotely. Because Votta affirmed that S. Garcia onboarded through DTO, and S. Garcia accessed a secure link to the DTO Portal that was "only systematically accessible outside the Dollar Tree network," the Court finds that S. Garcia's affidavit alleging that the store manager "scrolled through" the documents for her, does not create a genuine dispute of fact. ECF 111-11, at 3 ¶ 14.

Additionally, Votta affirmed that an associate "cannot agree to the [a]rbitration [a]greement without first previewing the [a]greement in a separate web browser window or tab." ECF 105-3, at 22 ¶ 86. And record evidence shows that S. Garcia clicked the button to agree that she had "received and read the Mutual Agreement to Arbitrate Claims," and "agree[s] to its terms" during the onboarding process.[36] ECF 105-3, at 201. Thus, there is sufficient evidence that S. Garcia entered into an arbitration agreement.

Similarly, Plaintiff Eady completed onboarding through Taleo on June 12, 2019. ECF 105-3, at 19 ¶ 72. On Taleo, after signing in with a unique username and confidential password, Eady (according to Votta) "affirmatively clicked through each page of the Open Door Communications Guidelines and Mutual Agreement to Arbitrate." *Id.* at 20 ¶ 74. On June 12, 2019, Eady "agreed to the [a]rbitration [a]greement by inputting the last four digits of his social security number in the box provided for his electronic signature." *Id.*; ECF 105-3, at 160.[37] Eady did not provide a declaration to rebut any of these assertions, and notably, Eady is not mentioned at all in Plaintiffs'

---

[36] The Arbitration Agreement in effect at the time of S. Garcia's onboarding was the 2016 Arbitration Agreement. ECF 105-3, at 22 ¶ 86.

[37] Votta affirmed that "Taleo could not have recorded the data in Exhibit T unless Eady followed the [] steps to agree to the arbitration agreement." ECF 105-3, at 20 ¶ 75.

opposition to the Motion. *See generally* ECF 111.[38] In light of the above, the Court is satisfied that Eady entered into an enforceable arbitration agreement.

### B.    Plaintiffs are not Exempt from the FAA

Plaintiffs argue that the proffered arbitration agreements are exempt from the FAA under the "transportation workers" exemption found in § 1 of the FAA. ECF 111, at 28. Specifically, Plaintiffs contend that "although Plaintiffs did not themselves transport any goods across state lines, they handled goods that were in the stream of interstate commerce prior to the 'last leg of the shipment to their destination' into the hands and homes of consumers[.]" ECF 111, at 29–30 (citing *Miller v. Citibank, N.A.*, Civ. No. TDC-23-0643, 2023 WL 6910711 (D. Md. Oct. 18, 2023)). Defendants respond that "Plaintiffs fail to introduce any evidence about their job responsibilities, let alone evidence that they are in a 'class of workers' that plays any role in the transportation of goods." ECF 119, at 23. Defendants also maintain that courts have "already rejected Plaintiffs' argument that the exemption applies to employees like sales associates." ECF 119, at 24 (citing *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 121 (2001); *Schuler v. B & L Sys., LLC*, No. 24-cv-219, 2024 WL 4035986, at *3 (W.D. Mich. Sept. 4, 2024); *Landaverde v. CarMax Auto Superstores, Inc.*, Civ. No. 24-0071, 2024 WL 3915099, at *7 (C.D. Cal. July 11, 2024); and *Miller*, 2023 WL 6910711, at *6).

Section 1 of the FAA excludes coverage for "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. Plaintiffs are obviously not railroad employees or seamen. The question is whether Plaintiffs

---

[38] It appears from the docket that Eady attempted to dismiss his claims, but the notice of voluntary dismissal was marked as "filed in error" because the attorney filing the dismissal had not been admitted pro hac vice. ECF 109; ECF 110. As of the time of the filing of this opinion, no pro hac vice motion or updated notice of voluntary dismissal has been filed on behalf of Eady. Thus, he remains a Plaintiff in the case and must be compelled to arbitration.

fit within the so-called "residual clause" of § 1, which applies to "any other class of workers engaged in foreign or interstate commerce." *Id.* For the following reasons, the Court finds that the residual clause is inapplicable here, rendering enforcement of the arbitration agreements appropriate under the FAA.

The Supreme Court has held that "the § 1 exclusion provision be afforded a narrow construction." *Circuit City*, 532 U.S. at 118. More specifically, the exclusion provision is "limited to workers engaged in the shipment and transportation of goods." *O'Neil,* 115 F.3d at 274 (explaining that "[i]f Congress had wished to exempt all employees from the coverage of the FAA it could have said so").[39]

In *Circuit City Stores, Inc. v. Adams*, the Supreme Court rejected an argument that retail sales counselors at Circuit City stores were "a class of workers engaged in foreign or interstate commerce" and held that the exemption addressed in § 1 is confined to "transportation workers," which consist of workers who are actually "engaged in transportation" relating to "the free flow of goods." 532 U.S. at 110. In *Southwest Airlines Company v. Saxon,* the Supreme Court held that workers who loaded and unloaded cargo from airplanes fell within the category of "transportation workers" covered by this exemption but clarified that such workers "must at least play a direct and 'necessary role in the free flow of goods' across borders" or "must be actively

---

[39] Plaintiffs cite *Miller v. Citibank* and indicate in the parenthetical that the court in *Miller* found the "bank employee not covered by exemption, but not[ed] employees who work for companies selling actual goods traveling in interstate commerce were far closer to exemption." ECF 111, at 30. What the *Miller* court actually said was that "where [the workers in the *Circuit City* case] worked in companies that sold actual goods that traveled in interstate commerce, the workers in *Circuit City* deemed not covered by the exemption were closer than [the employees in *Miller*] to the definition of transportation workers[.]" *Miller*, 2023 WL 6910711, at *6. In short, the court in *Miller* was simply pointing out that a class of workers "closer to [the] exemption" than the plaintiff in *Miller* were nonetheless deemed *ineligible* for the exemption by the Supreme Court. *Id.* Thus, *Miller* does not support Plaintiffs' argument that the sales associates in this case fall within the narrow § 1 exclusion provision.

'engaged in transportation' of those goods across borders via the channels of foreign or interstate commerce." 596 U.S. 450, 458 (2022) (quoting *Circuit City*, 532 U.S. at 121).

Plaintiffs acknowledge that they are not actively engaged in the transportation of goods across borders via the channels of interstate commerce. *See* ECF 111, at 29–30 ("[A]lthough Plaintiffs did not themselves transport any goods across state lines, they handled goods that were in the stream of interstate commerce prior to the last leg of the shipment to their destination into the hands and homes of consumers[.]" (quotation marks omitted)). Thus, the outcome turns on whether Plaintiffs played a "direct and necessary role in the free flow of goods across borders." *Saxon*, 596 U.S. at 458 (quotation marks and citation omitted).

This case is readily distinguishable from *Rittman v. Amazon.com, Inc.*, in which the Ninth Circuit found that workers who "pick up packages that have been distributed to Amazon warehouses, certainly across state lines, and transport them for the last leg of the shipment to their destination" fall within the exemption even if they do not themselves cross state lines." 971 F.3d 904, 915 (9th Cir. 2020). Here, Plaintiffs, by their own description, are "associates at Defendants' stores," ECF 111, at 28, not delivery persons transporting packages, and the Court is unpersuaded that the delivery of packages for the "last leg of the shipment," is akin to a retail associate selling merchandise. As previously noted, the Fourth Circuit has held that "[i]f Congress had wished to exempt all employees from the coverage of the FAA it could have said so." *O'Neil*, 115 F.3d at 274. The Court finds that Plaintiffs have adduced no evidence that the "actual work" they carry out as sales associates plays a "direct and necessary role in the free flow of goods across borders." *Saxon*, 596 U.S. at 458. The Court therefore finds that the exemption in § 1 of the FAA does not apply to Plaintiffs.

Moreover, the inquiry into whether the exemption applies to a specific class of workers focuses on "what [the plaintiff] does at [the company], not what [the company] does generally." *Id.* at 456 (explaining that "the word 'engaged'. . . emphasizes the *actual work* that the members of the class, as a whole, typically carry out" (emphasis added)). Thus, the Court is not convinced by Plaintiffs' argument that the exemption applies because "all four versions of the arbitration agreements purportedly assented to by Plaintiffs contain an 'Interstate Commerce' clause in which the parties explicitly agreed the Defendants are 'engaged in transactions involving interstate commerce and that Associate's application for and/or employment is related to such interstate transactions.'" ECF 111, at 28 (citations omitted). While it is undisputed that *Defendants* are engaged in interstate commerce, this clause fails to convey anything about the actual work that Plaintiffs do as sales associates. And a statement that an application for employment is "related" to a company's interstate transactions is not, by itself, enough to expand the otherwise narrow exemption provision in § 1. As the Supreme Court made clear in *Saxon*, the inquiry focuses on the plaintiff's engagement in transactions involving interstate commerce, not the company's engagement. 596 U.S. at 456.

Indeed, to interpret the exemption otherwise would allow the exception to swallow the rule. *See Hamrick v. Partsfleet, LLC*, 1 F.4th 1337, 1345 (11th Cir. 2021) ("To read the exemption to include 'a worker employed by a company whose business dealings happen to cross state lines,' would allow [section one]'s exception to swallow the general policy requiring the enforcement of arbitration agreements as pronounced' in section two of the [FAA].'" (citation omitted)). As Defendants point out, applying Plaintiffs' theory of the exemption provision would "mean no employee of any company engaged in interstate commerce (a requirement for the FAA to apply) could be subject to the FAA." ECF 119, at 25; *see O'Bryan v. Flowers Foods, Inc.*, 629 F. Supp.

3d 377, 388 (D.S.C. Sept. 21, 2022) (finding the exemption in § 1 did not apply where the company's "transportation function is incidental to the overall mission of the business—to make and sell baked goods[,]" and explaining that "[t]o find otherwise would cause § 1's residual clause exemption to swallow the rule and turn the presumption of arbitrability on its head."). Accordingly, the transportation workers exemption does not apply to Plaintiffs.

**C.    The Arbitration Agreement Delegates Questions of Arbitrability to the Arbitrator.**

The Fourth Circuit has recognized that "parties to an arbitration agreement can 'agree to arbitrate gateway questions of arbitrability, such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy.'" *Gibbs v. Haynes Invests., LLC*, 967 F.3d 332, 337 (4th Cir. 2020) (quoting *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010)). "An agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other." *Rent-A-Center*, 561 U.S. at 70. At the same time, "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (alterations and quotation marks removed). "The clear and unmistakable standard is exacting, and the presence of an expansive arbitration clause, without more, will not suffice" to show a valid delegation. *Peabody Holding Co., LLC v. United Mine Workers of Am., Int'l Union*, 665 F.3d 96, 102 (4th Cir. 2012) (quotation marks removed). When an agreement "clearly and unmistakably" delegates the threshold issue of arbitrability to the arbitrator, the Court must enforce that delegation clause and send that question to arbitration. *Gibbs*, 967 F.3d at 337 (quoting *Rent-A-Center*, 561 U.S. at 67). Courts typically find that where an arbitration agreement explicitly incorporates arbitral rules, like JAMS or AAA rules, such provisions constitute "clear

44

and unmistakable evidence" of intent to arbitrate arbitrability. *See Collins v. Discover Fin. Servs.*, Civ. No. PX-17-3011, 2018 WL 6434503, at *2 (D. Md. Dec. 7, 2018) (collecting cases).

At the outset, the Court notes that 18 Plaintiffs[40] are subject to the express language of the delegation clause in the October 2020 agreement. *See* ECF 105-3 at 102 (October 2020 arbitration agreement). The October 2020 agreement did not incorporate the JAMS rules by reference; instead, it contains a plain delegation clause in the text of the agreement: "The arbitrator shall have the exclusive authority to resolve any disputes or claims regarding arbitrability or the formation, interpretation, validity, applicability, unconscionability, or enforceability of this Agreement or any provision of this Agreement except as otherwise provided herein." *Id.* at 103; *see also Carson v. Giant Food. Inc.*, 175 F.3d 325, 330–31 (4th Cir. 1999) ("Those who wish to let an arbitrator decide which issues are arbitrable need only state that 'all disputes concerning the arbitrability of particular disputes under this contract are hereby committed to arbitration,' or words to that clear effect."). Plaintiffs appear to not dispute that the October 2020 arbitration agreement, by its plain language, expressly delegates questions of arbitrability to the arbitrator. ECF 111, at 31. Rather, Plaintiffs argue that "[a]s to Plaintiffs who applied for employment and/or onboarded with the October 2020 agreement, the experiences of Plaintiffs C. Rivera, McNanna, Moss, Matczak, Jeffries, and Garland uniformly show Defendants' pattern and practice of forging and coercing signatures on agreements with those Plaintiffs," and thus "undermine . . . mutual assent to these agreements." ECF 111, at 32. However, the Court has already held that there was sufficient assent

---

[40] Plaintiffs Adkisson, Barnett, Cooke, Cox, DeShon, Hasenei, Ingram, Jacobson, McDaniel, Mintz, Player, A. Rivera, Garland, Jeffries, Matczak, McNanna, Sinnett, and C. Rivera agreed to the October 2020 arbitration agreement. Defendants include D. Garcia as a Plaintiff bound by the October 2020 agreement, ECF 119, at 19 n.15, but Votta's declaration indicates that D. Garcia was bound by the 2019 arbitration agreement, ECF 105-33, at 21 ¶ 80, and Defendants concede that D. Garcia was on the returned mailer list, ECF 119, at 15 n.10, thus there is no valid argument that D. Garcia is bound by the October 2020 agreement.

to the arbitration agreement for 22 Plaintiffs, and the alleged experiences of certain Plaintiffs during the onboarding process do not give rise to a blanket inference that all signatures on all arbitration agreements were "forg[ed] and coerc[ed]," especially in light of the Court's finding that 16 Plaintiffs agreed to arbitration during the online employment application process, which did not involve Defendants' store managers in any way.[41] Thus, 18 Plaintiffs are bound by the October 2020 agreement, which contains language that "specifically and plainly" delegates arbitrability to the arbitrator. *See Novic v. Credit One Bank, Nat'l Ass'n*, 757 F. App'x 263, 265 (4th Cir. 2019) ("[T]o meet the 'clear and unmistakable' standard, an agreement must contain language specifically and plainly reflecting the parties' intent to delegate disputes regarding arbitrability to an arbitrator.").

Plaintiffs next contend that "[b]ecause Plaintiffs Alvarado, Brantley, D. Garcia, S. Garcia, Moss, Player, and Sinnett only ever applied for employment or were onboarded with the 2016, 2019, or August 2020 versions of the agreements, Defendants have decidedly failed to show these

---

[41] Additionally, Defendants contend that "Plaintiffs cannot rely on the declarations of the eleven Declarant Plaintiffs to create a fact dispute as to the [other] twelve Plaintiffs." ECF 119, at 9 n.5. The Court agrees. This case, as demonstrated by the charts submitted by both parties, ECF 111-2, at 2–5, ECF 119-1, at 2–4, requires a Plaintiff-specific and fact-intensive inquiry into whether there was mutual assent to sufficiently specific terms such that a contract was created. The question of an individual plaintiff's assent depends upon the circumstances in which each plaintiff allegedly entered into the arbitration agreement. Thus, declarations by certain Plaintiffs cannot be used to create a generalized fact dispute as to the remaining Non-Declarant Plaintiffs, who did not submit declarations or other evidence that they did not intend to be bound. As discussed *supra*, Defendants produced record evidence that 16 Plaintiffs signed the arbitration agreement as part of their online employment applications. The Court finds that there are no facts about the Non-Declarant Plaintiffs in the record from which the Court could infer there was no valid contract formation. Many of the Non-Declarant Plaintiffs are mentioned by name only in Plaintiffs' chart (ECF 111-2). Meanwhile, Defendants produced competent evidence that each of the Non-Declarant Plaintiffs agreed to arbitration as a condition of employment.

Plaintiffs ever manifested assent to delegate the question of arbitrability to the arbitrator."[42]  ECF

111, at 32.  The Court has already determined that Plaintiffs Brantley and Moss cannot be

compelled to arbitration due to material fact disputes.  And the Court has further determined that

Plaintiffs Player and Sinnett assented to the October 2020 arbitration agreement by continuing

employment after receiving notice of the updated mandatory arbitration agreement.  Thus, the

Court is left to determine whether the arbitration agreements agreed to by Plaintiffs Alvarado, D.

Garcia, S. Garcia, and Eady[43] delegate questions of arbitrability to the arbitrator.  The 2016 and

2019 arbitration agreements explicitly reference and incorporate the JAMS Employment

Arbitration Rules & Procedures ("JAMS Rules"), which include the following delegation clause:

"Jurisdictional and arbitrability disputes, including disputes over the formation, existence, validity,

interpretation or scope of the agreement . . . shall be submitted to and ruled on by the Arbitrator."[44]

---

[42] Because the Court found that there is a genuine dispute of fact over whether Plaintiffs Brantley
and Moss entered into an enforceable arbitration agreement, the Court cannot find at this stage that
Brantley and Moss agreed to delegate questions of arbitrability to the arbitrator. *Johnson v. Cont'l
Fin. Co., LLC*, 690 F. Supp. 3d 520, 526 (D. Md. 2023) ("If . . . the parties never formed an
agreement to arbitrate, then the Arbitration Provision's delegation of decisions to the arbitrator
also is neither binding nor enforceable.").  Accordingly, the Court's analysis in this section does
not apply to Plaintiffs Brantley and Moss, who are not being compelled to arbitrate their cases at
this time.

[43] Plaintiffs do not mention Eady at all in the response in opposition to the Motion.  The record
shows that Eady agreed to the 2016 arbitration agreement, ECF 105-3, at 19 ¶ 72, but because
Eady is not mentioned in Plaintiffs' response as a party contesting whether arbitrability issues are
delegated to the arbitrator, the Court deems that argument waived as to Plaintiff Eady and will not
further analyze it here.  The incorporation of the JAMS rules in the 2016 arbitration agreement is
sufficient to show intent to delegate questions of arbitrability to the arbitrator.

[44] Specifically, the arbitration agreement states: "The arbitration shall be held in accordance with
the then-current JAMS Employment Arbitration Rules & Procedures (and no other rules), which
are currently available at http://www. jamsadr.com/rulesemployment-arbitration.  A link to this
site can also be found at www.dtarbitration.com." ECF 105-3, at 172.

*See* JAMS Rule 11(b).[45]  Plaintiffs aver that the "incorporation of JAMS rules cannot establish Plaintiffs' intent to delegate arbitrability" because Plaintiffs are not sophisticated parties as contemplated in *Simply Wireless, Inc. v. T-Mobile US, Inc.*, 877 F.3d 522, 527–28 (4th Cir. 2017). ECF 111, at 31 (arguing that Plaintiffs are "individuals who applied for and worked as non-managerial employees at Defendants' retail stores," and therefore are unsophisticated parties). Defendants contend that "[t]here is nothing wrong with incorporating by reference the JAMS Rules for any party, sophisticated or not," and in any event, "Plaintiffs do not cite to any evidence regarding their lack of sophistication." ECF 119, at 19–20.

A brief review of the state of the case law on this point is necessary.  In *Simply Wireless*, the Fourth Circuit held that "when . . . two sophisticated parties expressly incorporate into a contract JAMS Rules that delegate questions of arbitrability to an arbitrator, then that incorporation constitutes the parties' clear and unmistakable intent to let an arbitrator determine the scope of arbitrability." *Simply Wireless*, 877 F.3d at 529, *abrogated on other grounds by Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63 (2019).  However, as Judge Hollander has pointed out, "the Fourth Circuit twice stated in *Simply Wireless* that its holding applied to agreements between *sophisticated actors*." *Malamatis*, 2022 WL 1591406, at *24 (citing *Simply Wireless*, 877 F.3d at 528–29) (emphasis in original).  The Fourth Circuit "did not specify whether the incorporation of arbitration rules provides clear and unmistakable evidence of the parties' intent when at least one of the parties is not sophisticated, let alone provide guidance as to how a court might distinguish between sophisticated and unsophisticated parties." *Id.*  Accordingly, Judge

---

[45] JAMS Rules are available at https://www.jamsadr.com/rules-employment-arbitration/english. The Court takes judicial notice of the JAMS Rules. *See Whitt v. Prosper Funding LLC*, No. 15-cv-136, 2015 WL 4254062, at *8 n.2 (S.D.N.Y. July 14, 2015) (taking judicial notice of arbitration forum rules referenced in arbitration agreement).

Hollander concluded that "it remains an open question in this Circuit whether the incorporation of arbitration rules provides 'clear and unmistakable' evidence of an unsophisticated party's intent to arbitrate arbitrability." *Id.* at 25.

Courts have applied the reasoning of *Simply Wireless* differently, depending on the circumstances. In *Stone v. Wells Fargo Bank, N.A.*, Judge Hollander noted that she was "not persuaded that a single cross-reference to the AAA Rules provides 'clear and unmistakable' evidence of plaintiff's intent to arbitrate arbitrability" in a case involving "a Fortune 500 company and a consumer." 361 F. Supp. 3d 539, 555 (D. Md. 2019). In reaching this conclusion, Judge Hollander reasoned that "[i]t strains credulity to believe that the consumer knew—much less intended—that the cross-reference directed an arbitrator to decide arbitrability." *Id.*

However, a similar argument was rejected in *Collins v. Discover Financial Services*, where Judge Xinis held that the "agreements include AAA and JAMS rules which clearly state that issues of arbitrability [are] to be determined by the arbitrator," and thus, plaintiffs provide "no sound basis for this Court to find that certain of the provisions in the cardmember agreements are sufficiently plain to bind them, yet others are not." *Collins*, 2018 WL 6434503, at *3. Judge Xinis also noted that "[t]his determination is consistent with courts reaching similar questions involving 'unsophisticated' parties." *Id.* (collecting cases).

Finally, in *Ashworth v. Five Guys Operations, LLC*, the court addressed the practical reality of incorporating arbitration rules by reference in an arbitration agreement between a restaurant employee and a company:

> Incorporation by reference of an obscure body of rules to show a clear and unmistakable intent to adhere to one rule specifically is preposterous. It is so unlikely as to be bordering on the absurd that an unsophisticated party, such as an employee of a fast food restaurant, would know what the AAA is, much less the contents of its governing rules. The intent of the agreement is undoubtedly clear and unmistakable to the authors, most likely

> employers, but the intent is obfuscated, possibly intentionally, for the employee unless the employee happens to know the AAA rules, a ridiculous assumption, or takes the time to read the rules and specifically notices, among all the other rules, the rule permitting the arbitrator to determine gateway issues. How this could be considered clear and unmistakable can only be explained if the true meanings of "clear" and "unmistakable" are ignored.

Civ. No. 16-6646, 2016 WL 7422679, at *3 (S.D. W. Va. Dec. 22, 2016). Nevertheless, the court enforced the delegation clause and held that the incorporation by reference of the AAA rules constituted clear and unmistakable expression of the parties' intent to leave gateway issues to the arbitrator, not the court. *Id.* The court explained that, despite its reservations, it was unwilling to make a different determination "in light of the unanimity of opinion among federal courts." *Id.*

As a general matter, this Court agrees with the *Ashworth* court that it is highly unlikely that Plaintiffs, who were non-managerial employees at Dollar Tree and Family Dollar, would know what JAMS Rules are, much less the contents of the governing rules. Indeed, both Alvarado and S. Garcia expressly affirmed that they were "not familiar with JAMS or its rules." ECF 111-7, at 3 ¶ 15; ECF 111-11, at 4 ¶ 27. And this Court, like Judge Hollander, is skeptical that a cross-reference to the JAMS Rules provides "clear and unmistakable" evidence of the parties' intent to arbitrate arbitrability, given that one party is unsophisticated. *Stone*, 361 F. Supp. 3d at 555.

However, critical to this case is that Plaintiffs Alvarado, D. Garcia, and S. Garcia received not only the arbitration agreement, but also a "Frequently Asked Questions" document when they applied or onboarded. During the online application, "applicants are instructed to click on a hyperlink to 'review Dollar Tree's Mutual Agreement to Arbitrate Claims *and the Arbitration Program FAQs.*'" ECF 105-3, at 6 ¶ 13 (citing ECF 105-3, at 47–48) (emphasis added). The FAQ tab is clearly listed on the left side of the arbitration website. ECF 105-3, at 51. Additionally, the onboarding paperwork also included the FAQ document. *See* ECF 105-3, at 7 ¶ 19. The FAQ

document indicates that "[t]he purpose of these [FAQs] is to summarize certain terms of the [a]rbitration [a]greement between [the applicant/employee] and Dollar Tree." ECF 105-3, at 83. The very first question on the document is "what is arbitration?" and the answer provides a short summary of arbitration and indicates that "Dollar Tree's arbitration process will be administered under the Arbitration Rules provided by JAMS, a national provider of arbitration services. The JAMS website is www.jamsadr.com." *Id.* The second question is "how can I get a copy of the JAMS rules that apply in arbitration?" and the answer indicates, "[t]he JAMS Rules are accessible at www.jamsadr.com/rules-employment-arbitration or through Dollar Tree's arbitration website, www.dtarbitration.com. Dollar Tree will supply you with a printed copy of these JAMS Rules upon written request, which must be made by sending an email to dtarbitration@dollartree.com." *Id.* Importantly, Defendants have produced record evidence that Plaintiffs Alvarado, D. Garcia, and S. Garcia all electronically signed the FAQ document, in addition to the arbitration agreement. *See* ECF 105-3, at 86 (Alvarado signature); ECF 105-3, at 180 (D. Garcia signature); ECF 105-3, at 206 (S. Garcia signature).[46]

Under these circumstances, the Court finds that while incorporation of the JAMS rules by reference in the arbitration agreement might not, by itself, put the unsophisticated Plaintiffs on notice of the JAMS rules and their significance, the FAQ document lays out, in plain terms (and in the first two questions on the document) that JAMS rules apply to the arbitration agreement. ECF 105-3, at 83. Further, the FAQ document hyperlinks the JAMS website and the JAMS rules and offers to provide a printed copy of the JAMS rules upon written request. *Id.* Accordingly, the Court finds that this additional notice, which Defendants presumably included to summarize the

---

[46] Additionally, the arbitration website contains a tab labeled "JAMS Rules & Procedures." ECF 105-3, at 51.

arbitration agreement in plain language, is sufficient to put the Plaintiffs on notice that the arbitration agreement incorporated the JAMS rules by reference. And because the JAMS rules clearly and unmistakably delegate questions of arbitrability to the arbitrator, Plaintiffs' contentions that the scope of the arbitration agreement does not cover data breach, or this dispute, are reserved for the arbitrator to decide. ECF 111, at 32–33.

**D.    9 U.S.C. § 4.**

The Court grants Defendants' motion to compel arbitration with respect to all Plaintiffs except for Plaintiffs Brantley and Moss.[47] Material fact disputes remain for those Plaintiffs.

If the "making of the arbitration agreement . . . be in issue, the court shall proceed summarily to the trial thereof." 9 U.S.C. § 4; *Berkeley Cnty. Sch. Dist.*, 944 F.3d at 234 (referring to this portion of 9 U.S.C. § 4 as the "Trial Provision"). That is, "the court is obliged to conduct a trial under the Trial Provision when a party unequivocally denies that an arbitration agreement exists, and show[s] sufficient facts in support thereof." *Berkeley Cnty. Sch. Dist.*, 944 F.3d at 234 (internal quotation marks omitted). "If the record reveals a genuine dispute of material fact regarding the existence of an agreement to arbitrate, the court shall proceed summarily and conduct a trial on the motion to compel arbitration." *Id.* (internal quotation marks omitted).

Plaintiffs assert that "[a]t a minimum, Plaintiffs have presented sufficient genuine issues of fact to rebut Defendants' putative record of these agreements to allow Plaintiffs to proceed to a jury trial on the motion to compel arbitration." ECF 111, at 18. The Court agrees that a material fact dispute related to the making of an arbitration agreement exists but only as to Plaintiffs Brantley and Moss. Thus, 9 U.S.C. § 4 requires this Court to "proceed summarily to [] trial." *See*

---

[47] Neither party submits that Plaintiff Meyers can be compelled to arbitration, thus the Court's analysis does not apply to Meyers.

9 U.S.C. § 4. Accordingly, the Court will hold a jury trial on the issue of whether Plaintiffs Brantley and Moss agreed to be bound by the arbitration agreement.

The Fourth Circuit has declined to "delineate the pretrial procedures to which a court should adhere," in these circumstances, and instead reserves the procedures to "the able lawyers for the parties and the sound discretion of [the district court]." *Berkeley Cnty. Sch. Dist.*, 944 F.3d at 242. As such, the Court directs counsel to confer about an appropriate procedure. Counsel should discuss whether a brief period of discovery is appropriate, when the parties will be ready for trial on the matter, and any other relevant issues.

If the parties agree on the appropriate procedure, they shall file a joint submission on the docket no later than April 11, 2025. If the parties do not agree, each side shall on that same date submit a brief, limited to 2000 words, directed exclusively to the appropriate procedure for resolving the material factual disputes.[48]

### E.    Class Action Waiver

The arbitration agreements state that the parties "agree to bring any dispute on an individual basis only, and not on a class or collective basis." *See* ECF 105-3, at 65 (October 2020 class and collective action waiver); ECF 105-3, at 93 (2019 class and collective action waiver); ECF 105-3, at 198 (2016 class and collective action waiver). Therefore, according to the agreements, "there will be no right or authority for any dispute to be brought, heard, or arbitrated as a class or collective action." *See id.* The class action waiver is enforceable as to the 22 Plaintiffs who

---

[48] The Court notes again that the parties do not dispute that Plaintiff Meyers cannot be compelled to arbitration. The Court declines to address the parties' dispute over whether the non-arbitrable claims, including Plaintiff Meyers's claims, against Defendants should be stayed pending resolution of the individual arbitrations. The Court reserves judgment on that issue until the factual disputes over contract formation for Plaintiffs Brantley and Moss are resolved. The claims against Dollar Defendants by the 22 Plaintiffs compelled to arbitration are stayed pending arbitration.

assented to the arbitration agreement, and thus those Plaintiffs may not pursue class claims against Dollar Defendants. *See Epic Sys.*, 584 U.S. at 525 (holding that class action waivers are enforceable).

## IV.    CONCLUSION

For the foregoing reasons, Defendants' Motion to Compel Arbitration, ECF 105, is **GRANTED** in part and **DENIED** in part. The Motion is granted as to Plaintiffs Adkisson, Barnett, Cooke, Cox, DeShon, Eady, D. Garcia, Hasenei, Ingram, Jacobson, McDaniel, Mintz, A. Rivera, Garland, Jeffries, Matczak, McNanna, C. Rivera, Alvarado, Player, Sinnett, and S. Garcia. The Motion is denied as to Plaintiffs Brantley and Moss and the matter shall proceed to a jury trial on the issue of formation of the arbitration agreement, pursuant to 9 U.S.C. § 4.

A separate implementing Order will issue.


Dated: <u>March 26, 2025</u>                                              <u>        /s/        </u>
                                                                        Brendan A. Hurson
                                                                        United States District Judge