# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

JAHNISHA GORDON, *et al.*,

      Plaintiffs,

v.

ZEROED-IN TECH., LLC, *et al.*,

      Defendants.

Civil No. 23-3284-BAH

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

This case involves a consolidated complaint filed by current and former employees of Dollar Tree and Family Dollar against Dollar Tree, Family Dollar, and Zeroed-In Technologies, following an alleged cyberattack (the "Data Breach") experienced by Zeroed-In Technologies. The putative class ("Plaintiffs") brought suit against Zeroed-In Technologies ("Defendant" or "Zeroed-In") alleging negligence and negligence *per se* (Count I[1]), breach of third-party beneficiary contract (Count IV), unjust enrichment (Count VI), breach of fiduciary duty (Count VIII), and violation of the California Consumer Privacy Act (Count XI) against Zeroed-In.[2] *See* ECF 90. Plaintiffs also seek declaratory and injunctive relief against Zeroed-In (Count XII). *Id.*

---

[1] Plaintiffs also brought suit against Dollar Tree and Family Dollar (collectively, "Dollar Defendants") for claims of negligence and negligence *per se* (Count II), breach of implied contract and breach of implied covenant of good faith and fair dealing (Count III), breach of confidence (Count V), unjust enrichment (Count VII), breach of fiduciary duty (Count IX), bailment (Count X), and violation of the California Consumer Privacy Act (Count XI) against Dollar Defendants. Those counts will not be addressed here.

[2] Dollar Defendants filed a Motion to Compel Arbitration, ECF 105, which will be addressed in a separate memorandum opinion. Dollar Defendants only seek to compel arbitration for the claims brought by Plaintiffs against the Dollar Defendants. *Id.*

Pending before the Court is Defendant's Motion to Dismiss the Consolidated Class Action Complaint (the "Motion"). ECF 96. Plaintiffs filed an opposition, ECF 99, and Defendant filed a reply, ECF 102. All filings include memoranda of law.[3] The Court has reviewed all relevant filings and finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2023). Accordingly, for the reasons stated below, Defendant's Motion is **GRANTED** in part and **DENIED** in part.

## I.    BACKGROUND[4]

Zeroed-In Technologies, LLC is a data management company which provides human resources data analytics software products to businesses. ECF 90, at 16 ¶ 110. Zeroed-In's data analytics products include data extraction, data staging, data transformation, and graphing or charting of data.[5] *Id.* Dollar Tree was a client of Zeroed-In, utilizing Zeroed-In's human resources data analytics products. *Id.* at 17 ¶ 113. Accordingly, Dollar Tree shares personally identifiable information ("PII") with Zeroed-In for hosting and processing purposes in connection with a subscription to Zeroed-In's products and services. *Id.* at 17, 19 ¶¶ 113, 122. Specifically, Zeroed-In collected from Dollar Tree the PII of Dollar Tree's current and former employees, including but not limited to, names, dates of birth, and Social Security numbers. *Id.* at 19 ¶ 124.

On August 8, 2023, Defendant Zeroed-In detected suspicious activity on its network systems, prompting Zeroed-In to launch an investigation into the nature and scope of the activity. *Id.* at 20 ¶ 126. Zeroed-In confirmed that an unauthorized actor gained access to Zeroed-In's

---

[3] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page.

[4] For purposes of considering Defendant's motion to dismiss, the Court takes the facts alleged in the Complaint as true. *See Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009).

[5] The main purpose of data analytics is to tackle an organization's particular issues or questions (*e.g.*, understand consumers, improve internal processes, generate business opportunities, etc.) to encourage better business results. *Id.* at 17 ¶ 117.

systems between August 7, 2023 and August 8, 2023. *Id.* ¶ 127. Zeroed-In was able to determine which of its systems were accessed but claimed "it was not able to confirm all of the specific files that were accessed or taken by the unauthorized actor." *Id.* ¶ 128 (citing Notice of Data Event letter). Zeroed-In conducted a review of the contents of its compromised systems to pinpoint what information was present at the time of the incident, to whom the information relates, and to which Zeroed-In customers the information belonged. *Id.* ¶ 129. After review, Zeroed-In determined that the following data types were compromised in the Data Breach: individual names, dates of birth, and Social Security numbers. *Id.* ¶ 130. Both Dollar Tree and Family Dollar were affected by the Data Breach, and Plaintiffs allege that the PII of approximately 1.97 million individuals was compromised and exposed in the Data Breach. *Id.* at 21 ¶ 132. On November 27, 2023, Zeroed-In uploaded a "Notice of Data Event" letter on the Maine Attorney General website, notifying Maine residents of the Data Breach. *Id.* ¶ 134. Zeroed-In sent a similar notice letter to impacted individuals (the "Notice Letter").[6] *Id.*

Plaintiffs allege that Defendant "failed to use reasonable data security procedures and practices appropriate to the nature of the sensitive information they collected, stored, and maintained—such as encrypting the information or deleting it when it is no longer needed—resulting in a massive data breach that exposed Plaintiffs' and Class Members' Private Information." *Id.* at 22 ¶ 137. According to Plaintiffs, as a result of this failure, "cybercriminals

---

[6] According to Plaintiffs, "[o]mitted from the Notice Letter are the details of the root cause of the Data Breach, the vulnerabilities exploited, and the specific remedial measures undertaken to ensure such a breach does not occur again. To date, these critical facts have not been explained or clarified to Plaintiffs or Class Members, who retain a vested interest in ensuring that their Private Information remains confidential and secure." *Id.* ¶ 135.

accessed and acquired files containing unencrypted Private Information belonging to Plaintiffs and Class Members, including their names, dates of birth, and Social Security numbers."[7]  *Id.* ¶ 138.

In the weeks following the Notice Letters, 25 complaints were filed in various courts. ECF 96-1, at 13. Eventually, all 25 actions were ultimately transferred to and/or consolidated in this Court. ECF 23, 62, 88. On April 15, 2024, former and current Dollar Tree Employees who allegedly received the Notice Letters (collectively "Plaintiffs") filed a Consolidated Class Action Complaint (the "Complaint"). ECF 90.

In the Complaint, Plaintiffs allege that the Data Breach was a "direct and proximate result of Defendants' failure to properly safeguard and protect Plaintiffs' and Class Members' Private Information from unauthorized access, use, and disclosure, as required by various state and federal regulations, industry practices, and common law, including: [] Zeroed-In's failure to establish and implement appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiffs' and Class Members' PII to protect against reasonably foreseeable threats to the security or integrity of such information." *Id.* at 33 ¶ 189. Specifically, Plaintiffs aver that "[h]ad Defendant[] remedied the deficiencies in their information storage and security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, they would have prevented intrusion into its information storage and security systems and, ultimately, the theft of the PII of nearly 2 million individuals." *Id.* at 34 ¶ 190. Plaintiffs also allege that they have been harmed by the "fraudulent misuse of their PII, and have been placed at an imminent, immediate, and continuing increased risk of additional harm from identity theft and identity fraud, requiring them to take the time which they otherwise would have dedicated to other

---

[7] Defendant maintains that the company made a substantial ransom payment to the cyber criminals in an attempt to ensure that the cyber criminals did not distribute or misuse the information they purportedly accessed. ECF 96-1, at 12.

life demands such as work and family in an effort to mitigate both the actual and potential impact of the Data Breach on their lives." *Id.* ¶ 191. Specifically, Plaintiffs contend that they have suffered, and will continue to suffer, injuries, including actual misuse of their compromised PII, invasion of privacy, lost or diminished value of PII, lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, loss of the benefit of their bargain, an increase in spam calls, texts, and/or emails, and the increased risk of misuse of their PII. *See generally* ECF 90. Defendant moves to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).

## II.   **LEGAL STANDARD**

### A.   **12(b)(1)**

Under Federal Rule of Civil Procedure 12(b)(1), the plaintiff bears the burden of proving, by a preponderance of evidence, the existence of subject matter jurisdiction. *See Demetres v. E. W. Constr., Inc.*, 776 F.3d 271, 272 (4th Cir. 2015); *see also Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999). Rule 12(b)(1) allows a defendant to move for dismissal based upon the belief that the plaintiff has failed to make that showing. When, as in this case, a defendant asserts that the plaintiff has failed to allege facts sufficient to establish subject matter jurisdiction, the allegations in the complaint are assumed to be true under the same standard as in a Rule 12(b)(6) motion, and "the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009).

### B.   **12(b)(6)**

Federal Rule of Civil Procedure 12(b)(6) governs dismissals for failure to state a claim upon which relief can be granted. In considering a motion under this rule, courts discount legal conclusions stated in the complaint and "accept as true all of the factual allegations contained in

the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court then draws all reasonable inferences in favor of the plaintiff and considers whether the complaint states a plausible claim for relief on its face. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

"The complaint must offer 'more than labels and conclusions' or 'a formulaic recitation of the elements of a cause of action[.]'" *Swaso v. Onslow Cnty. Bd. of Educ.*, 698 F. App'x 745, 747 (4th Cir. 2017) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). At the same time, a "complaint will not be dismissed as long as [it] provides sufficient detail about [the plaintiff's] claim to show that [the plaintiff] has a more-than-conceivable chance of success on the merits." *Owens v. Balt. City State's Off.*, 767 F.3d 379, 396 (4th Cir. 2014).

## III.    ANALYSIS

Plaintiffs assert claims of negligence and negligence *per se* (Count I), breach of third-party beneficiary contract (Count IV), unjust enrichment (Count VI), breach of fiduciary duty (Count VIII), violation of the California Consumer Privacy Act (Count XI), and declaratory and injunctive relief (Count XII) against Defendant. Defendant moves to dismiss pursuant to Fed. R. Civ. P. 12(b)(1), arguing that Plaintiffs lack standing. Defendant also moves to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), arguing that Plaintiffs have failed to state a claim for each Count. The Court will first address standing before turning to the merits.

### A.    Standing

"[T]o establish standing, a plaintiff must show (i) that he suffered an injury-in-fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC*

*v. Ramirez*, 594 U.S. 413, 423 (2021) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). The plaintiff bears the burden of establishing standing, as the plaintiff "is the party seeking to invoke federal jurisdiction." *Friends for Ferrell Parkway, LLC v. Stasko*, 282 F.3d 315, 320 (4th Cir. 2002) (citing *Lujan*, 504 U.S. at 561). "[W]hen a defendant challenges a plaintiff's standing, we analyze the challenge differently depending on the stage of litigation at which the challenge is brought and the substance of the defendant's arguments." *Overbey v. Mayor of Balt.*, 930 F.3d 215, 227 (4th Cir. 2019). When, as here, "'standing is challenged on the pleadings, [the court will] accept as true all material allegations of the complaint and construe the complaint in favor of the complaining party.'" *Deal v. Mercer Cnty. Bd. of Educ.*, 911 F.3d 183, 187 (4th Cir. 2018) (quoting *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 181–82 (4th Cir. 2013)).

Additionally, "when the actions of a third party are involved, '[t]he case or controversy limitation of Art. III still requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court.'" *Springmeyer v. Marriott Int'l, Inc.*, No. 20-cv-867-PWG, 2021 WL 809894, at *2 (D. Md. Mar. 3, 2021) (alteration in original) (quoting *Doe v. Obama*, 631 F.3d 157, 161 (4th Cir. 2011)). "Where the plaintiff is attempting to bring a putative class action, any named plaintiffs must allege that they personally have been injured." *Burger v. Healthcare Mgmt. Sols., LLC*, Civ. No. RDB-23-1215, 2024 WL 473735, at *5 (D. Md. Feb. 7, 2024) (citing *Warth v. Seldin*, 422 U.S. 490, 502 (1975)). Defendant does not dispute that the alleged injuries could be redressed by a favorable decision. Rather, Defendant's challenge is to whether Plaintiffs have adequately alleged that they suffered an injury-in-fact that is traceable to Defendant's conduct.

7

1.    Plaintiffs Adequately Allege Injury-in-Fact

Plaintiffs argue that they suffered "concrete and cognizable injuries due to Zeroed-In's conduct," including loss of privacy, diminished value of PII, fraud and identity theft, imminent threat of fraud and identity theft, out-of-pocket expenses and lost time and productivity spent remedying or mitigating the Data Breach's impacts, and emotional harm. ECF 99, at 14–15. Defendant argues that the harms are "abstract" and "generic" and do not suffice to establish Article III standing. ECF 96-1, at 17.

An injury-in-fact requires "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 561 (internal quotation marks and citations omitted). A threatened future injury "must be *certainly impending* to constitute an injury-in-fact" and allegations of "possible future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (emphasis in original). The Supreme Court also noted, however, that plaintiff is not required to demonstrate that it is "literally certain that the harms they identify will come about." *Id.* at 414 n.5. Indeed, the Court has previously found standing "based on a 'substantial risk' that the harm will occur." *Id.* "The most obvious concrete injuries are tangible harms, such as physical harms and monetary harms. Intangible harms are trickier, but they too can be concrete." *O'Leary v. TrustedID, Inc.*, 60 F.4th 240, 242 (4th Cir. 2023) (cleaned up).

i.    *Actual Misuse of PII and Imminent Risk of Injury of Identity Theft*

Defendant argues that "Plaintiffs have not shown that the PII involved in the Ransom Event[8] was misused, such that there exists a 'certainly impending' risk of future harm." ECF 96-1, at 20. Plaintiffs allege that their PII "has already been misused." ECF 99, at 17.

---

[8] Defendant refers to the Data Breach as the "Ransom Event."

Two Fourth Circuit cases are critical to the Court's inquiry in evaluating injury in a data breach case. First, in *Beck v. McDonald*, the court considered two consolidated appeals brought by plaintiffs who sued after their personal information was allegedly compromised. 848 F.3d 262, 266–67 (4th Cir. 2017). In one underlying case, a laptop computer containing unencrypted patient information was either lost or stolen. *Id.* at 267. In the other, "four boxes of pathology reports headed for long-term storage" and containing 'personal information "had been misplaced or stolen." *Id.* at 268. In both cases, the plaintiffs alleged injury-in-fact based on an increased risk of identity theft, but the district court dismissed the claims for lack of standing. *Id.* at 267–69.

The Fourth Circuit affirmed, agreeing that the harms alleged were too speculative to establish standing because they required the court to engage with and credit an "attenuated chain of possibilities." *Id.* at 275 (quoting *Clapper*, 568 U.S. at 410). To find harm, the court would have to assume "that the thief targeted the stolen items for the personal information they contained" and that the thief would "then select, from thousands of others, the personal information of the named plaintiffs and attempt successfully to use that information to steal their identities." *Id.* This chain of possibilities was not sufficient to confer standing, especially since there was no indication that the information had been stolen for the purpose of identity theft or that any plaintiff was the victim of identity theft. *Id.*

The following year, the Fourth Circuit considered *Hutton v. National Board of Examiners in Optometry*, involving three optometrist-plaintiffs whose personal information was allegedly stolen when thieves stole data from the defendant. 892 F.3d 613, 616 (4th Cir. 2018). Despite allegations that, after the data breach, unauthorized persons opened credit cards in the plaintiffs' names, that their identities had thus been stolen, and that they had spent time and money on mitigation, the district court dismissed the claims for lack of standing. *Id.* at 617–18.

9

The Fourth Circuit distinguished *Hutton* from *Beck* and reversed the district court's ruling, explaining that "[i]n *Beck*, the plaintiffs alleged only a threat of future injury in the data breach context where a laptop and boxes" containing personal information "had been stolen, but the information contained therein had not been misused." *Id.* at 621–22. In contrast, the plaintiffs in *Hutton* "allege[d] that they ha[d] already suffered actual harm in the form of identity theft and credit card fraud." *Id.* at 622. Plaintiffs in *Hutton* had thus "been concretely injured by the data breach" because someone used or attempted to use their information to open credit cards without their knowledge. *Id.* Unlike in *Beck*, the Fourth Circuit held that this harm was not speculative and was sufficient to allege injury-in-fact. *Id.*

Accordingly, the Court must determine whether this case is more like *Beck*, or more like *Hutton*. Unsurprisingly, Defendant relies on *Beck*, while Plaintiffs rely on *Hutton*. As Judge Gallagher of this Court has explained, "[c]ases following *Hutton* have generally found plaintiffs to establish standing when they show actual misuse of the stolen data[,]" while "courts frequently dismiss cases for lack of standing when the plaintiffs fail to show any resulting misuse of their data." *Stamat v. Grandizio Wilkins Little & Matthews, LLP*, Civ. No. SAG-22-00747, 2022 WL 3919685, at *5 (D. Md. Aug. 31, 2022) (collecting cases). There is no dispute that "a mere compromise of personal information, without more, fails to satisfy the injury-in-fact element in the absence of an identity theft." *Hutton*, 892 F.3d at 622. In short, "[a]ctual misuse is the keystone of Article III injury in Fourth Circuit data breach case law." *Capiau v. Ascendum Machinery, Inc.*, No. 24-cv-00142, 2024 WL 3747191, at *4 (W.D.N.C. Aug. 9, 2024) (collecting cases).

Here, all Plaintiffs except two set forth allegations of actual misuse. Plaintiff Adkisson "experienced incidents of fraud and identity theft when unauthorized third-party criminals orchestrated a tax relief scam[,] stole $295 from [] Adkisson's checking account[,]" and when she

"experienced suspicious activity on her credit report which lists an unknown 2018 Nissan Altima," as well as "suspicious activity on her credit card, which required her to be issued a new credit card." *See* ECF 90, at 36 ¶ 198–99. Plaintiff Alvarado was involved in an incident where "an unknown third party [stole] her payroll debit card, prompting Cash App to cancel it and issue a new account," and "Experian informed [] Alvarado that her Private Information had been found on the dark web." *Id.* at 38 ¶ 209. Plaintiff Barnett was informed by Experian that her "Social Security number is available on the [d]ark [w]eb, and that her Social Security number has been found in association with an unknown Texas address," despite Barnett having never lived in Texas. *Id.* at 39–40 ¶ 219. Plaintiff Brantley alleges that she has "already been the victim of identity theft," and has "received a notice from an unknown individual by phone, mail, or text about an 'account inquiry.'" *Id.* at 41 ¶ 232. Additionally, Brantley received information that following the Data Breach, "her Private Information was posted on the dark web," and Brantley then "took steps to obtain a credit freeze as a result of learning this information." *Id.* at 42 ¶ 233. Plaintiff Cooke has "experienced incidents of fraud and identity theft," including on September 8, 2023, when "an unknown person, using [Cooke's] Social Security number, opened a bank account under her name and personal information. *Id.* at 43 ¶ 243. Cooke then received a letter from the bank in October 2023 "informing her that she had insufficient funds in the fraudulent account." *Id.* Plaintiff Cox experienced "attempts [by a third party] to fraudulently withdraw funds in her bank account in February and March 2024." *Id.* at 45 ¶ 254. Plaintiff Deshon has "experienced spam calls, texts, and mail as a result of the Data Breach," and alleges that she "suffer[s] imminent and impending injury arising from the present and substantially increased risk of future fraud, identity theft, and misuse." *Id.* at 47 ¶ 266. Plaintiff Eady "received calls from a local hospital, claiming that he owed the hospital money for an unpaid debt," even though Eady "never actually incurred

this debt." *Id.* at 48 ¶ 275. Plaintiff S. Garcia "experienced incidents of fraud and identity theft in the form of multiple unauthorized charges and attempted charges to her bank account." *Id.* at 51 ¶ 295. Plaintiff Garland "has already been the victim of identity theft," when his "CashApp account was used by an unknown and unauthorized individual to make two separate charges of $50.00." *Id.* at 52 ¶ 305. Garland also reports that he "received various strange e-mail messages since the Data Breach from unknown individuals asking him to participate in contests." *Id.* at 53 ¶ 308. Plaintiff Hasenei received "a fraud alert from her bank on November 25, 2023 about a $39.99 credit charge she did not make." *Id.* at 54 ¶ 316. Plaintiff Ingram "received suspicious emails in or around October or November 2023 informing him that his Private Information was being utilized in fraudulent loan applications," and additionally, "received notifications that his personal information has been found on the dark web as a result of the Data Breach." *Id.* at 55–56 ¶¶ 325, 326. Plaintiff Jeffries "received an alert that an unauthorized individual attempted to use his Private Information to apply for a credit card in his name" in September 2023. *Id.* at 58 ¶ 345. Jeffries also "experienced an increased number of spam emails and spam phone calls," which eventually "forced [him] to change his cellphone number." *Id.* at 58–59 ¶ 346. Plaintiff Matczak "experienced increases in spam calls and texts, including spam calls addressing her by name." *Id.* at 60 ¶ 356. Plaintiff McDaniel has also "experienced an increase in spam calls, texts, and/or emails." *Id.* at 61–62 ¶ 366. Plaintiff McNanna "experienced incidents of fraud and identity theft [] in the form of a CashApp alert in December 2023 that a fraudster was trying to take money from his bank account using another CashApp account." *Id.* at 63 ¶ 375. Plaintiff Meyers "experienced a significant increase in spam calls, emails, and text messages" and the "increase in spam was especially notable in the first few months following the Data Breach wherein [] Meyers received approximately 30 to 50 spam calls per day." *Id.* at 64 ¶ 385. Plaintiff Mintz "experienced incidents

of fraud and identity theft [] in the form of unauthorized charges totaling $617.00 and multiple attempted unauthorized charges of large sums of money to her bank accounts." *Id.* at 66 ¶ 395. Plaintiff Moss experienced "several unauthorized charges on two different debit cards, some of which have not been reimbursed by her bank." *Id.* at 67 ¶ 406. Moss also "has a fraud alert on her credit report which caused her difficulty in obtaining a car loan." *Id.* at 67–68 ¶ 406. Plaintiff Player experienced "fraudulent withdrawals and transactions from her checking account." *Id.* at 69 ¶ 417. Player also "received a notice [on September 21, 2023] that her Social Security number was found published on the dark web." *Id.* ¶ 418. Plaintiff A. Rivera "receiv[ed] two credit cards in the mail that she did not apply for." *Id.* at 71 ¶ 429. Plaintiff C. Rivera had an "unauthorized actor fraudulently using her Social Security number in another state," and as a result, she "experienced denial of unemployment benefits because her Social Security number was already being used." *Id.* at 73 ¶ 439. Plaintiff Sinnett was "alerted [through her credit card provider] on or around October 17, 2023 that her Social Security number was found on the dark web." *Id.* at 74 ¶ 450.

These allegations "bring the actual and threatened harm out [of] the realm of speculation and into the realm of sufficiently imminent and particularized harm to satisfy the injury-in-fact requirement for Article III standing" for 23 Plaintiffs. *In re Marriott Int'l, Inc., Customer Data Security Breach Litig.*, 440 F. Supp. 3d 447, 459 (D. Md. 2020). In short, this case is controlled by *Hutton*, not *Beck*. Critically, *Beck* hinged on the fact that plaintiffs had "uncovered no evidence that the information contained on the stolen laptop ha[d] been accessed or misused or that they ha[d] suffered identity theft, nor, for that matter, that the thief stole the laptop with the intent to steal their private information." *Beck*, 848 F.3d at 274. In essence, *Beck* stands for the proposition that a plaintiff fails to establish Article III standing based solely on harm resulting from the

*increased risk of future identity theft* and the cost of measures to protect against it. But the Court need not rely on increased risk of future identity theft here. Rather, Plaintiffs have plausibly alleged that actual identity theft, or circumstances that give rise to a plausible inference of identity theft, have already occurred for many Plaintiffs. *See Sikes v. Sree Hotels, LLC*, No. 24-cv-679, 2024 WL 5130865, at *2 (W.D.N.C. Dec. 16, 2024) ("One way for a data breach plaintiff to establish actual misuse—and thus Article III injury—is to credibly plead 'that their data [has] been used in a fraudulent manner' as a consequence of the breach." (citations omitted)). Thus, *Beck* is inapposite because Plaintiffs have alleged that their personal information has already been misused. Similarly, Defendant's reliance on *Stamat*, *Chambliss*, and *Khan* is unpersuasive given the allegations of actual misuse of PII. *See Stamat*, 2022 WL 3919685, at *6 ("[Plaintiff] alleges no actual misuse of his personal data . . . [a]ll potential harms and misuses of his data remain hypothetical."); *Chambliss v. Carefirst, Inc.*, 189 F. Supp. 3d 564, 571 (D. Md. 2016) ("Plaintiffs do not cite to a single instance of data misuse even though a significant amount of time has passed since the data breaches."); *Khan v. Children's Nat'l Health Sys.*, 188 F. Supp. 3d 524, 532 (D. Md. 2016) ("[Plaintiff] alleges no facts indicating that the hackers have attempted to engage in any misuse of [] patients' personal information since the breach was discovered . . . [plaintiff] alleges no suspicious activity: no unauthorized bank accounts or credit cards, no medical fraud or identity theft, and no targeted solicitations for health care products or services.").

Even Defendant appears to concede that at least two Plaintiffs allege actual misuse of their information. *See* ECF 96-1, at 21 ("[O]ther than Cooke and Cynthia Rivera, Plaintiffs allege no actual misuse of the PII involved in the Ransom Event (name, date of birth, and SSN)."). The Court finds that it is not only two Plaintiffs who have experienced actual misuse; rather, 23 of the 25 Plaintiffs have credibly alleged actual misuse. Thus, the Court finds that those 23 Plaintiffs

sufficiently allege that their data "has been stolen, accessed, and used in a fraudulent manner." *Hutton*, 892 F.3d at 622.

Defendant argues in the opening brief that Plaintiff Jacobson "makes no allegation whatsoever of any unauthorized use of her PII." ECF 96-1, at 23. Plaintiffs respond that "[e]ven if Plaintiff Jacobson . . . does not allege her PII has *already* been misused, she nevertheless alleges an injury-in-fact in the impending risk of identity theft she now faces." ECF 99, at 18 (citation omitted) (emphasis in original). Defendant does not address Plaintiff D. Garcia's allegations in its opening brief but alleges in the reply brief that D. Garcia also does not allege actual misuse of PII. ECF 102, at 6.

A threatened injury constitutes an injury-in-fact when it "is certainly impending" or there is a "substantial risk" of future harm. *Clapper*, 568 U.S. at 409, 414 n.5 (internal quotation marks omitted); *see Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citing *Clapper* for the proposition that a threat of future injury is sufficient to confer standing if it is either "certainly impending" or there is a "substantial risk that the harm will occur" (internal quotation marks omitted)). "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes." *Beck*, 848 F.3d at 271 (internal quotation marks omitted). Sufficiently imminent injuries-in-fact cannot be premised on a "highly attenuated chain of possibilities." *Clapper*, 568 U.S. at 410.

Judge Grimm addressed a similar argument to that advanced by Defendant here in *In re Marriott*. There, defendants argued that certain plaintiffs "did not themselves allege actual misuse" and thus those plaintiffs had "failed to establish injury-in-fact." *In re Marriott*, 440 F. Supp. 3d at 460. In rejecting that argument, Judge Grimm held that "[t]he allegations about the

targeting of personal information in the cyberattack and the allegations of identity theft by other plaintiffs whose personal information was stolen makes the threatened injury sufficiently imminent." *Id.* So too here. While Plaintiffs Jacobson and D. Garcia do not allege actual misuse, they have nonetheless adequately pled imminent threat of identity theft. EFC 90, at 50 ¶ 287; ECF 90, at 57 ¶ 336. Thus, Jacobson and D. Garcia need not wait to suffer actual misuse given that "there are 'allegations that suffice [] to push the threatened injury of future identity theft beyond the speculative to the sufficiently imminent.'" *In re Marriott*, 440 F. Supp. 3d at 460 (quoting *Beck*, 848 F.3d at 274). Additionally, "where credit card and social security numbers are stolen, the future harm is not speculative as '[w]hy else would hackers break into a store's database and steal consumers' private information?'" *Chambliss*, 189 F. Supp. 3d at 571 (citing *Remijas v. Neiman Marcus Group, LLC*, 794 F.3d 688, 694 (7th Cir. 2015)). Accordingly, Jacobson and D. Garcia have established injury-in-fact based on the non-speculative imminent threat of identity theft. All of the remaining Plaintiffs have established injury-in-fact based on allegations of actual and threatened harm.

### ii.    *Loss of Privacy*

Defendant argues that "Plaintiffs' other allegations of purported damage—loss of privacy, diminished value of their private information, mitigation efforts, and emotional distress—only constitute an injury-in-fact when raised in conjunction with facts sufficiently demonstrating actual misuse of PII involved in the underlying data event." ECF 102, at 12. Because the Court has found that 23 Plaintiffs sufficiently allege actual misuse of PII, it necessarily follows, under Defendant's own reasoning, that Plaintiffs' other allegations of injury also sufficiently constitute an injury-in-fact. The Court will nevertheless address each injury in turn.

Defendant maintains that Plaintiffs have failed to identify potential damages arising from a loss of privacy, and thus loss of privacy, in and of itself, cannot provide the basis for Article III standing. ECF 96-1, at 17. As discussed above, this is just another argument that Plaintiffs have failed to allege a concrete and particularized injury. But the Court has already found that 23 Plaintiffs have alleged actual misuse, which is a concrete injury-in-fact that confers standing. *See, e.g., Bank of La. v. Marriott Int'l Inc.*, 438 F. Supp. 3d 433, 439–40 (D. Md. 2020) ("[A]ctual identity theft in the form of unauthorized credit card charges" constitutes injury-in-fact for standing.). And the remaining two Plaintiffs have established injury-in-fact based on the non-speculative imminent threat of identity theft. Thus, given the allegations of actual and threatened misuse in the Complaint, loss of privacy is a cognizable injury. *Cf. Khan*, 188 F. Supp. 3d at 532–33 (finding loss of privacy does not constitute an injury-in-fact where plaintiff "allege[d] no suspicious activity" to her accounts and did not "identif[y] any potential damages arising from [the] loss"),

### iii.    Diminished Value of PII

Defendant next contends that "[a]bsent allegations explaining how their PII is less valuable than it was before the Ransom Event, diminution in value of PII will not support standing in data breach cases." ECF 96-1, at 18. Plaintiffs respond that the district court in *In re Marriott* "deemed the diminished value of compromised PII a concrete injury based on allegations that the defendant collected and paid to analyze that information, the complaint's citations to third-party sources recognizing the value of PII and the importance of PII's integrity in 'our increasingly digital economy,' and allegations that the plaintiffs' exposed PII had already been misused." ECF 98, at 16 (citing 440 F. Supp. 3d at 461–62). According to Plaintiffs, they "allege the same here," and thus have sufficiently proved injury-in-fact from their PII's diminished value. *Id.*

17

In the Complaint, Plaintiffs allege that "[t]he PII of consumers is of high value to criminals," and "personal information can be sold at prices ranging from $40 to $200." ECF 90, at 24 ¶ 146. Plaintiffs also allege that the "loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud." *Id.* ¶ 147. Indeed, Plaintiff C. Rivera had an "unauthorized actor fraudulently using her Social Security number in another state," and as a result, she "experienced denial of unemployment benefits because her Social Security number was already being used." *Id.* at 73 ¶ 439. Moreover, several Plaintiffs were notified that their private information, including their Social Security numbers, appear on the dark web. ECF 90, at 38 ¶ 209; *id.* at 39–40 ¶ 219; *id.* at 42 ¶ 233; *id.* at 55–56 ¶¶ 325, 326; *id.* at 69 ¶ 418; *id.* at 74 ¶ 450. And other Plaintiffs allegedly suffered from suspicious activity on credit reports, fraudulent accounts opened in their names, and fraudulent loan applications filed in their names. ECF 90, at 36 ¶ 198–99; *id.* at 43 ¶ 243; *id.* at 55–56 ¶ 325. As Judge Grimm pointed out, "[w]hether someone can obtain a mortgage, credit card, business loan, tax return, or even apply for a job depends on the integrity of their personal identifying information." *In re Marriott*, 440 F. Supp. 3d at 462. As just one example of the difficulties that stem from identity theft, Plaintiff Moss alleges that she "has a fraud alert on her credit report which caused her difficulty in obtaining a car loan." *Id.* at 67–68 ¶ 406. Thus, the Court finds that Plaintiffs have sufficiently alleged diminution in value of PII as a basis for standing given there are allegations of concrete injury, including, *inter alia*, fraudulent accounts and loan applications opened in Plaintiffs' names, along with other specific allegations that the Data Breach interfered with Plaintiffs' fiscal autonomy by impairing their ability to participate in the economic marketplace. *See Smallman v. MGM Resorts Int'l*, 638 F. Supp. 3d 1175, 1191 (D. Nev. 2022) (finding diminished value of PII to be a cognizable theory of damages where data breach "devalued Plaintiffs' PII by interfering with their

fiscal autonomy"); *see also In re Marriott*, 440 F. Supp. 3d at 462 ("[T]he value of consumer personal information is not derived solely (or even realistically) by its worth in some imagined market place where the consumer actually seeks to sell it to the highest bidder, but rather in the economic benefit the consumer derives from being able to purchase goods and services remotely and without the need to pay in cash or a check.").

*iv.    Mitigation Efforts*

Plaintiffs allege that they spent "time which they otherwise would have dedicated to other life demands such as work and family in an effort to mitigate both the actual and potential impact of the Data Breach on their lives," ECF 90, at 34 ¶ 191, and thus this also establishes injury-in-fact. Defendant argues that Plaintiffs "have not alleged facts to establish a 'certainly impending' identity theft," and therefore cannot "conjure standing" through self-imposed mitigation measures. ECF 96-1, at 20.

"[A]lthough incurring costs for mitigating measures to safeguard against future identity theft may not constitute an injury-in-fact when that injury is speculative, the Court has recognized standing to sue on the basis of costs incurred to mitigate or avoid harm when a substantial risk of harm actually exists[.]" *Hutton*, 892 F.3d at 623 (first citing *Beck*, 848 F.3d at 276, then citing *Clapper*, 568 U.S. at 414 n.5). In *Beck*, the Fourth Circuit held that "[m]itigation expenses do not qualify as actual injuries where the harm is not imminent." *Beck*, 848 F.3d at 276–77 (quoting *Remijas*, 794 F.3d at 694). In contrast, the Fourth Circuit held in *Hutton* that "[b]ecause the injuries alleged by the Plaintiffs are not speculative, the costs of mitigating measures to safeguard against future identity theft support the other allegations and together readily show sufficient injury-in-fact to satisfy the first element of the standing to sue analysis." *Hutton*, 892 F.3d at 622. In short, "the two theories of injury-in-fact stand or fall together." *In re Marriott*, 440 F. Supp. 3d at 460.

19

Because the alleged actual and threatened harm to the Plaintiffs is sufficiently non-speculative to establish injury-in-fact, Plaintiffs have also established injury-in-fact based on the alleged time and money spent to mitigate that harm.

*v.     Emotional Harm*

Defendant argues that "Plaintiffs—with the exception of Sinnett, who claims no emotional damage—allege nothing more than [] bare assertions of emotional harm[.]" ECF 96-1, at 20. Plaintiffs counter that the "emotional injuries [are] tied to concrete harms like loss of privacy and actual and impending identity theft," and thus do not involve bare assertions of emotional injury. ECF 99, at 20. Plaintiffs do not point the Court to any cases where emotional harm was found to be a cognizable injury under similar circumstances.[9] Plaintiffs broadly allege that they have suffered "stress, fear, and anxiety," as a result of the Data Breach. *See, e.g.,* ECF 90, at 46 ¶ 259; *id.* at 47 ¶ 269; *id.* at 49 ¶ 281. Thus, the Court finds that Plaintiffs do not sufficiently allege emotional harm as a cognizable injury for the purposes of standing. *See Capiau*, 2024 WL 3747191, at *7 ("[Plaintiff's] generalized allegations that the data breach caused him to suffer 'anxiety, sleep disruption, stress, fear, and frustration' are not concrete enough for Article III standing."). However, none of Plaintiffs' claims rely exclusively on emotional harm, therefore the lack of standing to recover emotional damages does not require dismissing any substantive legal claims.

*vi.     Indicia of Identity Theft*

---

[9] Plaintiffs cite *TransUnion LLC v. Ramirez*, 594 U.S. 413, 436 n.7 (2021) for the general proposition that "a plaintiff's knowledge that he or she is exposed to a risk of future physical, monetary, or reputational harm could cause its own current emotional or psychological harm." ECF 99, at 20. And Plaintiffs distinguish two other cases relied on by Defendant because those cases "do not involve the actual misuse of stolen PII and are therefore inapposite." *Id.* However, Plaintiffs do not provide any citations to cases that have found emotional harm to be a cognizable injury in the data breach context. *Hutton* did not address emotional harm. *See* 892 F.3d at 622.

20

Defendant also argues that "Plaintiffs do not provide any instance where their name, date of birth, and/or [Social Security number] were fraudulently misused." ECF 96-1, at 21. This argument is somewhat perplexing given that the allegations in the Complaint, which the Court accepts as true, reveal that Plaintiff Barnett was informed by Experian that her "Social Security number is available on the [d]ark [w]eb, and that her Social Security number has been found in association with an unknown Texas address," despite Barnett having never lived in Texas. ECF 90, at 39–40 ¶ 219. Plaintiff Cooke has "experienced incidents of fraud and identity theft," including on September 8, 2023, when "an unknown person, using [Cooke's] Social Security number, opened a bank account under her name and personal information. *Id.* at 43 ¶ 243. Plaintiff Ingram "received suspicious emails in or around October or November 2023 informing him that his Private Information was being utilized in fraudulent loan applications," and additionally, "received notifications that his personal information has been found on the dark web as a result of the Data Breach." *Id.* at 55–56 ¶¶ 325, 326. Plaintiff Jeffries "received an alert that an unauthorized individual attempted to use his Private Information to apply for a credit card in his name" in September 2023. *Id.* at 58 ¶ 345. Plaintiff Matczak "experienced increases in spam calls and texts, including spam calls addressing her by name." *Id.* at 60 ¶ 356. Plaintiff Player "received a notice [on September 21, 2023] that her Social Security number was found published on the dark web." *Id.* ¶ 418. Plaintiff C. Rivera had an "unauthorized actor fraudulently using her Social Security number in another state," and as a result, she "experienced denial of unemployment benefits because her Social Security number was already being used." *Id.* at 73 ¶ 439. Plaintiff Sinnett was "alerted [through her credit card provider] on or around October 17, 2023 that her Social Security Number was found on the dark web." *Id.* at 74 ¶ 450. Thus, Plaintiffs clearly

provide evidence of fraudulent misuse of their names, dates of birth, and Social Security numbers.[10]

Defendant further argues that even if "the alleged charges and withdrawals [to bank and credit card accounts] could conceivably have resulted from the Ransom Event, Plaintiffs still do not plead an injury-in-fact because they do not allege that they were required to pay for the charges." ECF 96-1, at 21. The Court finds this argument equally unpersuasive. As an initial matter, Plaintiff Moss specifically alleges "several unauthorized charges on two different debit cards, *some of which have not been reimbursed by her bank.*" ECF 90, at 67 ¶ 406 (emphasis added). In any event, "[t]he Fourth Circuit has not previously required that a plaintiff allege out-of-pocket loss from the fraudulent charges to establish an injury-in-fact; misuse or targeting of personal information by hackers, alone, may be sufficient." *McCreary v. Filters Fast, LLC*, No. 20-cv-595, 2021 WL 3044228, at *4 (W.D.N.C. July 19, 2021) (collecting cases); *see also Hutton*, 892 F.3d at 622 (explaining that injury-in-fact standing is not confined to those who can show economic harm (citing *United States v. Students Challenging Regulatory Agency Procs.*, 412 U.S. 669, 686 (1973))). Thus, Plaintiffs are not required to allege out-of-pocket loss to establish injury-in-fact.

2.    Plaintiffs' Injuries are Fairly Traceable to Defendant's Conduct

The "fairly traceable" requirement of standing "ensures that there is a genuine nexus between a plaintiff's injury and a defendant's alleged illegal conduct." *Friends of the Earth, Inc.*

---

[10] While some Plaintiffs do not explicitly allege fraudulent misuse of their Social Security numbers, they nonetheless establish actual misuse of their PII in the form of fraudulent accounts opened in their names, unauthorized charges or attempted withdrawals to accounts, and tax and credit-report related fraud. The Court can reasonably infer at this stage that these allegations are at least plausibly related to the unauthorized disclosure of Plaintiffs' names, dates of birth, and Social Security numbers. *See infra* Section III(A)(2).

*v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 161 (4th Cir. 2000). This traceability requirement does not mean a plaintiff must "show to a scientific certainty that defendant . . . caused the precise harm suffered." *Id.* In data breach cases, traceability is satisfied where the complaint "contain[s] allegations demonstrating that it is both plausible and likely that a breach of the [] database resulted in the fraudulent use of the Plaintiffs' personal information." *Hutton*, 892 F.3d at 623.

"Fourth Circuit courts have routine[ly] found traceability in the data breach context where plaintiffs provided defendants with PII and those defendants subsequently fell victim to a targeted data breach resulting in the disclosure and misuse of plaintiffs' PII." *See Capiau*, 2024 WL 3747191, at *7 (collecting cases). Those allegations are present here: Plaintiffs claim that their PII was given to Defendant by Plaintiffs' employer, ECF 90, at 19 ¶¶ 121, 122, and Defendant thereafter experienced a data breach involving Plaintiffs' PII. *Id.* at 20–21 ¶¶ 126–133. As established above, Plaintiffs have sufficiently alleged actual misuse or imminent threat of misuse of their PII in the wake of the Data Breach. Thus, the Complaint contains sufficient allegations that Defendant was a plausible and likely source of the disclosure and misuse of Plaintiffs' PII.

Defendant contends that "the vast majority of alleged fraud involves unauthorized charges and withdrawals and an increase in spam calls and emails, all involving information that Plaintiffs never provided to Zeroed-In." ECF 102, at 10 (emphasis removed). Plaintiffs point out, however, that "in addition to using stolen Social Security numbers to open new credit cards or accounts, 'a dishonest person who has your Social Security number can use it to get other personal information about you.'" ECF 99, at 22–23 (citing ECF 90, at 24 ¶ 147). In the Complaint, Plaintiffs specifically allege that "[t]he Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identify theft and extensive

financial fraud." ECF 90, at 24 ¶ 147. Further, Plaintiffs allege that "[o]nce PII is sold, it is often

used to gain access to various areas of the victim's digital life, including bank accounts, social

media, credit card, and tax details," and this can "lead to additional PII being harvested from the

victim." *Id.* at 25 ¶ 152. Given the highly sensitive nature of Social Security numbers, this Court

is satisfied at the pleading stage that "the information taken in the data breach [] gave hackers the

means to commit fraud or identity theft." *In re Zappos.com, Inc.*, 888 F.3d 1020, 1027 (9th Cir.

2018). The Court is ultimately not persuaded by Defendant's argument that fraudulent activity

related to credit cards and bank accounts severs traceability because that information was not

directly disclosed during the Data Breach. Names, dates of birth, and Social Security numbers

were disclosed in the Data Breach, and courts have repeatedly acknowledged the heightened risk

of harm given the sensitive nature of Social Security numbers and the increased risk of misuse.

*See Chambliss*, 189 F. Supp. 3d at 570 (acknowledging that the "breach compromised only

Plaintiffs' names, birthdates, email addresses, and subscriber identification numbers, and not their

social security numbers, credit card information, or any other similarly sensitive data that could

heighten the risk of harm"); *see also McMorris v. Carlos Lopez & Assocs., LLC*, 995 F.3d 295,

302 (2d Cir. 2021) ("Naturally, the dissemination of high-risk information such as Social Security

numbers and dates of birth—especially when accompanied by victims' names—makes it more

likely that those victims will be subject to future identity theft or fraud."). At this early stage of

litigation, the Court finds that Plaintiffs have plausibly alleged that the actual misuse or imminent

threat of misuse of PII is plausibly related to the Data Breach.

Defendant also contends that "personal information is widely available on the internet, and

because Plaintiffs fail to allege the necessary facts to establish a link between the alleged misuse

of PII and the Ransom Event, it is impossible to trace any one instance of fraud to this specific

24

incident." ECF 96-1, at 27. Courts have repeatedly rejected this argument. Plaintiffs are required only to show a genuine nexus between the alleged injuries and the data breach at this stage, which they have done. "[T]he fairly traceable standard is not equivalent to a requirement of tort causation." *Friends of the Earth, Inc.*, 204 F.3d at 161 (internal quotation marks and citations omitted). "It must simply be *plausible* that the [] data breach was the cause of [plaintiff's] injury." *See Bank of La.*, 438 F. Supp. 3d at 441 (emphasis in original). While Defendant "may ultimately show this injury was not caused by the data breach, that argument is more appropriate for a jury." *McCreary*, 2021 WL 3044228, at *5; *see also In re Marriott*, 440 F. Supp. 3d at 467 ("While Defendants may ultimately show, after the opportunity for discovery, that the alleged injuries are not caused by their data breach, it is premature to dismiss [p]laintiffs' claims on grounds of traceability."). Thus, Defendant's argument regarding potential causation by some other source is misplaced. Accepting the allegations in the Complaint as true, the injuries are "fairly traceable" to Defendant and Plaintiffs have established standing to the extent required at this stage. *See Lujan*, 504 U.S. at 560.

The standing elements of injury-in-fact and traceability are both sufficiently alleged in the Complaint. And the third standing element—redressability—has not been contested by Defendant. As a result, the Court finds that Plaintiffs have standing to sue.

**B.**   **Failure to State a Claim**

1.   Negligence and Negligence *Per Se*

Defendant contends that "Plaintiffs do not allege Zeroed-In owed a duty of care to them by demonstrating an 'intimate nexus with [Zeroed-In] through preexisting contractual privity or its equivalent.'" ECF 96-1, at 29 (citing *Bhambhani v. Innovative Health Sols., Inc.*, Civ. No. RDB-19-0355, 2020 WL 673180, at *7 (D. Md. Feb. 11, 2020)). Plaintiffs respond that "an 'intimate

nexus' between a plaintiff and defendant is a pre-requisite to duty under Maryland law if 'the failure to exercise due care creates a risk of economic loss only.'" ECF 99, at 26 (citations omitted).

> i.    *Plaintiffs sufficiently allege Defendant owed them a duty of care.*

"Maryland courts do not allow plaintiffs to recover for economic loss under a theory of negligence if they did not suffer physical injury, and if they are not in contractual privity with the defendant, unless the plaintiff can establish the equivalent of a contractual relationship sufficient to establish an 'intimate nexus' with the defendant." *In re Marriott Int'l, Inc., Customer Data Security Breach Litig.*, Civ. No. 19-2879-PWG, 2020 WL 6290670, at *6 (D. Md. Oct. 27, 2020) (first citing *Chicago Title Ins. v. Allfirst Bank*, 905 A.2d 366, 377–78 (Md. 2006), then citing *Balfour Beatty Infrastructure, Inc. v. Rummel Klepper & Kahl, LLP*, 155 A.3d 445, 454 (Md. 2017)). "[T]he economic loss doctrine serves as a boundary between contract law, the purpose of which is to enforce the expectations of the parties to an agreement, and tort law, the purpose of which is to protect people and property from foreseeable risks of harm by imposing upon others a duty of reasonable care." *Cash & Carry Am., Inc. v. Roof Sols., Inc.*, 117 A.3d 52, 61 (Md. App. 2015).

As an initial matter, the Court finds that the economic loss doctrine does not bar Plaintiffs' negligence claim because Plaintiffs allege both economic and non-economic harms, including loss of privacy, loss of time, and loss of control over their PII. In the data breach context, courts, albeit outside the Fourth Circuit, have found that an individual's loss of control over the use of their identity due to a data breach and the accompanying impairment to the value of their PII constitutes non-economic harms. *See Flores-Mendez v. Zoosk, Inc.*, No. 20-04929, 2021 WL 308543, at *3 (N.D. Cal. Jan. 30, 2021) ("Plaintiffs allege their loss of time, risk of embarrassment, and enlarged

risk of identity theft as harms and so do not allege pure economic loss."); *Mehta v. Robinhood Fin. LLC*, No. 21-cv-01013, 2021 WL 6882377, at *6 (N.D. Cal. May 6, 2021) (finding that the plaintiffs did not solely allege economic loss where they alleged harms derived from the "loss of control over the use of their identity" and right to privacy); *Stasi v. Inmediata Health Grp. Corp.*, 501 F. Supp. 3d 898, 913 (S.D. Cal. 2020) ("[T]ime spent responding to a data breach is a non-economic injury, that when alleged to support a negligence claim, defeats an economic loss doctrine argument."). Here, such an invasion similarly implicates non-economic harms.

However, even if the harms were purely economic, the Court finds that Plaintiffs sufficiently allege an intimate nexus with Defendant. "Maryland Courts do not require that the defendant be aware of the specific person who relied on its exercise of reasonable care, so long as that person, known or unknown, is not part of an indeterminate class of persons who might (unforeseeably) file claims against it, and so long as it is able to predict its liability exposure to an individual member of the foreseeable class and govern its conduct accordingly." *In re Marriott*, 2020 WL 6290670, at *7. "The main consideration is whether there is linking conduct—'enough to show the defendant knew or should have known of the plaintiff's reliance.'" *Id.* at *6 (citing *Balfour Beatty Infrastructure*, 155 A.3d at 457). Here, Plaintiffs allege that Zeroed-In "was fully aware of its obligation to protect the PII of its customers," and "knew that this information, if hacked, would result in injury to Plaintiffs and Class Members." ECF 90, at 29 ¶ 169. According to Plaintiffs, "[d]espite such awareness, [Zeroed-In] . . . failed to impose and maintain reasonable and appropriate data security controls to protect Plaintiffs' and Class Members' PII from unauthorized access that [Zeroed-In] should have anticipated and guarded against." *Id.* ¶ 168.

The Court finds that Plaintiffs have plausibly alleged that Dollar Tree "outsourced its data analytics needs to [] Zeroed-In by utilizing Zeroed-In's human resources data analysis software,"

ECF 90, at 19 ¶ 121, Defendant "collected from Dollar Tree the PII of Dollar Tree's current and former employees, including but not limited to names, dates of birth, and Social Security numbers," *id.* ¶ 124, and Defendant "failed to use reasonable data security procedures and practices appropriate to the nature of the sensitive information they collected, stored, and maintained—such as encrypting the information or deleting it when it is no longer needed—resulting in a massive data breach that exposed Plaintiffs' and Class Members' Private Information." *Id.* at 22 ¶ 137. Further, Defendant clearly acknowledged the importance of safeguarding sensitive PII as Defendant's Privacy Policy indicated that the company "employ[s] robust security measures to protect against the loss, misuse and alteration of the personal information under [their] control." *See id.* at 28 ¶ 166. And while Defendant indicated that they "cannot guarantee absolute security," Defendant also stated "[k]eeping your personal information secure is our first priority." *Id.* at 29 ¶ 166. Under these circumstances, the Court is satisfied that Plaintiffs have established the required nexus with Defendant. According to the allegations in the Complaint, which the Court accepts as true, Defendant acknowledged and appreciated the importance of protecting the PII it gathered from its customers, which included the PII of Dollar Tree employees.[11] Accordingly, there were circumstances "that would allow the defendant to predict its liability exposure." *Walpert, Smullian & Blumenthal, P.A. v. Katz*, 762 A. 2d 582, 606 (Md. 2000); *see also In re Marriott.*, 2020 WL 6290670, at *7 (finding an intimate nexus between the plaintiffs and defendant

---

[11] Given Defendant's explicit representation in the Privacy Policy that the company "employ[s] robust security measures" to protect against the loss of PII, ECF 90, at 28 ¶ 166, and statement that, "[k]eeping your personal information secure is our first priority," *id.* at 29 ¶ 166, this case is distinguishable from *Burger*, where "[plaintiff's] assertion that [d]efendants knew that Medicare beneficiaries relied on them to protect their Private Information [found] no support in the alleged facts or analogous cases." *Burger*, 2024 WL 473735, at *7. Here, it is reasonable to infer from the allegations in the Complaint that Defendant knew that its customers, including Dollar Tree and its employees, relied on the company to protect the employees' PII. The Court is unpersuaded by Defendant's conclusory assertion to the contrary. ECF 102, at 17.

when the plaintiffs were "not simply members of the public at large, *i.e.*, an indeterminate class of people, but rather a nationwide class of individuals whose personal information [defendant] explicitly assumed the responsibility of protecting, namely [another defendant's] 'guests' and 'customers.'").

*ii.*     *Plaintiffs adequately allege Defendant owed and breached a duty of care based on violations of the FTC Act.*

Maryland courts have made clear that "absent a special relationship, a defendant does not owe a duty to the general public to protect them from the actions of third parties." *In re Marriott*, 2020 WL 6290670, at *8 (citing *Warr v. JMGM Grp., LLC*, 70 A.3d 347, 358 (Md. 2013)). "[A] 'special duty' to protect another from the acts of a third party may be established '(1) by statute or rule; (2) by contractual or other private relationship; or (3) indirectly or impliedly by virtue of the relationship between the tortfeasor and a third party.'" *Remsburg v. Montgomery*, 831 A.2d 18, 27 (Md. 2003) (quoting *Bobo v. State*, 697 A.2d 1371, 1376 (Md. 1997)). "This 'special relationship' exception to the general bar against liability is narrowly construed." *Chang-Williams v. Dep't of the Navy*, 766 F. Supp. 2d 604, 620 (D. Md. 2011) (quoting *Patton v. U.S. of Am. Rugby Football*, 851 A.2d 566, 574 (Md. 2004)). Plaintiffs allege that Defendant "had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45 (the "FTC Act"), . . . including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data." ECF 90, at 82 ¶ 474.

In *In re Marriott*, which contained similar allegations to those advanced by Plaintiffs here, Judge Grimm held that the court "need not predict what the Maryland Court of Appeals would hold in this case with respect to the [] [p]laintiffs' arguments regarding the applicability of the special relationship doctrine, because they have sufficiently argued that [defendant] owed them a duty by virtue of Section 5 of the FTC Act." *In re Marriott*, 2020 WL 6290670, at *9. There, the

29

court held that "because the [] [p]laintiffs have sufficiently pleaded that Section 5 of the FTC Act serves as the predicate to Maryland's version of negligence *per se*, they have pleaded that [defendant] owed them a statutory duty to protect them from the actions of third-party hackers." *Id.* Plaintiffs assert that they "allege the same here" and thus "the same result" should follow. ECF 99, at 28.

Defendant first argues that "Maryland law does not recognize negligence *per se* as a separate cause of action." ECF 96-1, at 28. However, Plaintiffs clarify that they "do not assert an independent claim for negligence *per se*; they allege the negligence *per se* elements based on the FTC Act in support of their negligence cause of action." ECF 99, at 28. The Complaint shows that Plaintiffs do not assert a separate claim for negligence *per se*. *See* ECF 90, at 81 (Count I claim for "negligence and negligence *per se*"). Rather, Plaintiffs assert a common law theory of negligence, which is well-established under Maryland law, and argue that the FTC Act provides the standard of care against which Plaintiffs' negligence claim should be assessed. *See Kiriakos v. Phillips*, 139 A.3d 1006, 1016 (Md. 2016) ("We have often explained that a statute or ordinance can prescribe a duty and that violation of the statute or ordinance is itself evidence of negligence." (citations and quotation marks omitted)); *see also In re Marriott.*, 2020 WL 6290670, at *9 ("Instead of recognizing a separate cause of action of negligence *per se*, a statute or an ordinance can permit a plaintiff to prove that a defendant owed the plaintiff a duty, and that a defendant breached that duty." (citing *Kiriakos*, 139 A.3d at 1016)).[12] Under Maryland law, to successfully

---

[12] While Defendant is correct that "the FTC Act 'does not provide a private right of action,'" ECF 102, at 17 (citation omitted), Plaintiffs do not seek to maintain a suit directly under the FTC Act. Rather, Plaintiffs "assert a common law theory of negligence that is well established under Maryland state law," and merely "rely on the FTC Act to support their Maryland negligence claim." *In re Marriott*, 2020 WL 6290670, at *12; *see also* ECF 99, at 28 (arguing that Plaintiffs "do not assert an independent claim for negligence *per se*; they allege the negligence *per se* elements based on the FTC Act in support of their negligence cause of action").

plead that defendant's violation of a law or ordinance is evidence of negligence, a plaintiff must establish that: (1) they are members of a specific class of people that the statute or ordinance is designed to protect; and (2) that violation of the statute or ordinance proximately caused their injury. *Kiriakos*, 139 A.3d at 1016. "The Statute or Ordinance Rule is not a means to establishing negligence *per se* but only prima facie evidence of negligence." *Id.* (citations omitted).

Plaintiffs allege that they are "within the class of persons the provisions of the FTC Act were intended to protect and the type of harm that resulted from the Data Breach was the type of harm the statutes were intended to guard against." ECF 90, at 84 ¶ 482. As acknowledged above, "[a] 'special duty' to protect another from the acts of a third party can be created . . . 'by statute or rule . . . .'" *Johnson v. PNC Bank, N.A.*, Civ. No. ELH-19-3136, 2020 WL 1491355, at *5 (D. Md. Mar. 27, 2020) (first citing *Remsburg*, 831 A.2d at 27, then quoting *Bobo*, 697 A.2d at 1376). Section 5 of the FTC Act makes unlawful any "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1). Indeed, "[n]umerous courts have held that Section 5 of the FTC Act was designed to protect the consumer whose data was compromised by the negligent actions of a defendant." *In re Marriott*, 2020 WL 6290670, at *10 (collecting cases).

As to the first element, Plaintiffs plausibly allege that Defendant "gathered and stored the PII of Plaintiffs," and "[b]y assuming the responsibility to collect and store this data, Zeroed-In had duties of care to use reasonable means to secure and to prevent disclosure of the information, and to safeguard the information from theft." ECF 90, at 81 ¶¶ 470, 473. Plaintiffs also allege that Defendant breached its duties, pursuant to the FTC Act by: "[f]ailing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII," "[f]ailing to adequately monitor the security of its networks and systems," "allowing unauthorized access to Class

31

Members' PII," "[f]ailing to detect in a timely manner that Class Members' PII had been

compromised," "[f]ailing to remove former employees' PII they were no longer required to retain

pursuant to regulations," and "[f]ailing to timely and adequately notify Class Members about the

Data Breach's occurrence and scope, so that Class Members could take appropriate steps to

mitigate the potential for identity theft and other damages." *Id.* at 83 ¶ 480. Similar to *In re*

*Marriott*, Defendant was "specifically tasked with protecting [Plaintiffs'] data and breached that

duty by violating the FTC Act's requirement of implementing adequate security standards to

safeguard consumers' personal information." *In re Marriott.*, 2020 WL 6290670, at *10. Thus,

Plaintiffs have plausibly alleged that they are members of a specific class of people that Section 5

of the FTC Act is designed to protect.[13]

As to the second element—whether the violation proximately caused the injury complained

of—the Plaintiffs have also plausibly alleged facts sufficient to survive the motion to dismiss.

Under Maryland law, "[w]hen two or more independent negligent acts bring about an injury, the

'substantial factor' test controls." *Gambrill v. Bd. of Educ. of Dorchester Cnty.*, 281 A.3d 876,

---

[13] Again, *Burger* is inapposite because there, the plaintiff "fail[ed] to allege any facts that support
a special relationship between herself and either Defendant." *Burger*, 2024 WL 473735, at *9.
Judge Bennett relied on the fact that plaintiff had failed to allege that the defendants "'explicitly
assumed the responsibility of protecting Medicare recipients' data." *Id.* Here, Plaintiffs plausibly
allege that "Dollar Tree outsourced its data analytics needs to [] Zeroed-In by utilizing Zeroed-
In's human resources data analysis software," ECF 90, at 19 ¶ 121, and as part of that agreement,
Defendant "collected from Dollar Tree the PII of Dollar Tree's current and former employees,
including but not limited to names, dates of birth, and Social Security numbers," *id.* ¶ 124, and
thus "[by] assuming the responsibility to collect and store this data, Zeroed-In had duties of care
to use reasonable means to secure and to prevent disclosure of the information, and to safeguard
the information from theft." *Id.* at 81 ¶ 473. Importantly, Zeroed-In's Privacy Policy states that
the company "employ[s] robust security measures to protect against the loss, misuse and alteration
of the personal information under [their control]," and uses a "secure server environment that uses
firewalls, intrusion detection systems, and other advanced technology to protect against
interference or access from outside intruders." *Id.* at 28 ¶ 166. Thus, the Court is satisfied, at this
early stage of litigation, that Defendant assumed the responsibility of protecting Plaintiffs' highly
sensitive PII.

901 (Md. 2022) (citing *Pittway Corp. v. Collins*, 973 A.2d 771 (Md. 2009)). "Causation-in-fact may be found if it is 'more likely than not' that the defendant's conduct was a substantial factor in producing the plaintiff's injuries." *Collins*, 973 A.2d at 771.

Here, Plaintiffs allege that "PII was lost and accessed as the proximate result of Zeroed-In's failure to exercise reasonable care by adopting, implementing, and maintaining appropriate security measures." ECF 90, at 85 ¶ 495. Specifically, Plaintiffs detail what Defendant could have done to prevent the Data Breach, including encrypting the data and destroying it once no longer needed data, ECF 90, at 22 ¶ 137, cite to specific FTC guidelines Defendant allegedly failed to implement, *id.* at 27–28 ¶¶ 158–165, and list industry standards and best practices Defendant allegedly failed to follow, *id.* at 30–31 ¶¶ 172–177.[14] Plaintiffs also allege that "[a]s a direct and proximate result of Zeroed-In's negligence, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) the actual misuse of their compromised PII; (ii) invasion of privacy; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) an increase in spam calls, texts, and/or emails; and (vii) the continued and certainly increased risk to their PII[.]" ECF 90, at 85–86 ¶ 496. Drawing all reasonable inferences in favor of the Plaintiffs, the Complaint plausibly alleges that Defendant did not implement reasonable security protocols, which led to a data breach. Under these circumstances, the Court is satisfied that it is "more likely than not that the defendant's conduct was a substantial factor in producing the plaintiff's injuries." *Collins*, 973 A.2d at 771. As such, Plaintiffs have

---

[14] Given these specific factual allegations, this case is distinguishable from *Springmeyer v. Marriott International, Inc.*, where plaintiffs "fail[ed] to allege any facts describing [defendant's] cybersecurity or steps that it could have or should have taken to prevent this data breach." 2021 WL 809894, at *3.

successfully pled that Defendant's alleged violation of Section 5 of the FTC Act is prima facie evidence of negligence. Accordingly, Plaintiffs have sufficiently pled the element of duty to support a negligence claim under Maryland law.[15]

### 2.    Breach of Third-Party Beneficiary Contract

Defendant argues that Plaintiffs "fail to identify any facts whatsoever establishing that Zeroed-In entered into a contract with Dollar Tree with intent to benefit Plaintiffs." ECF 102, at 17. Plaintiffs contend that they "cannot be expected to have access to the contract between Defendants and in their sole possession," ECF 99, at 30, but that "allegations analogous to Plaintiffs' here—that the contract between Zeroed-In and Dollar Tree required Zeroed-In to maintain the security of Plaintiffs' PII—have been held sufficient for a third-party beneficiary breach of contract claim in similar data breach actions." *Id.* at 31 (citations omitted).

The Maryland Court of Appeals has explained the evolution of state law with respect to third-party beneficiaries:

> At common law, only a party to a contract could initiate an action to enforce its terms. However, the law has evolved since, such that certain beneficiaries to a contract may also bring an action to enforce its terms. Not all third parties that may benefit from a contract have the power to initiate an action to enforce its terms. Rather, a third party has the right to enforce a contract if the contract was intended for his [or her] benefit and it ∴ clearly appear[s] that the parties intended to recognize him [or her] as

---

[15] Defendant argues that Plaintiffs fail to allege duty, ECF 96-1, at 30, but otherwise Defendant does not address breach, causation, or injury, with respect to Plaintiffs' negligence claim. To establish negligence under Maryland law, a plaintiff must plead and prove the following four elements: "(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty." *Lloyd v. Gen. Motors Corp.*, 916 A.2d 257, 270–71 (Md. 2007). As previously established, Plaintiffs have plausibly alleged that Defendant owed Plaintiff a duty, ECF 90, at 82 ¶¶ 474–477, breached that duty by failing to exercise reasonable care in maintaining appropriate security measures, *id.* at 85 ¶ 495, and Plaintiffs suffered injury as a direct and proximate result, *id.* ¶¶ 495, 496. Thus, Plaintiffs have adequately pled the elements for a negligence claim under Maryland law.

> the primary party in interest and as privy to the promise. Such a third party
> is referred to as an "intended beneficiary."

*CX Reinsurance Co. Ltd. v. Johnson*, 282 A.3d 126, 135 (Md. 2022) (internal citations and quotation marks omitted). "The 'crucial fact' in determining whether a third party is an intended beneficiary of a contract is 'whether the pertinent provisions in the contract were 'inserted . . . to benefit' the third party.'" *Id.* (first citing *CR-RSC Tower I, LLC v. RSC Tower I, LLC*, 56 A.3d 170 (Md. 2012), then quoting *Lovell Land, Inc. v. State Highway Admin.*, 969 A.2d 284 (Md. 2009)). "Another factor to consider . . . is whether the third party is named in the contract or its antecedent agreements." *Id.* (internal quotation marks and citations omitted).

Plaintiffs allege that "[u]pon information and belief, Zeroed-In entered into contracts to provide services to its clients, which services included data security practices, procedures, and protocols sufficient to safeguard the Private Information that was to be provided to it." ECF 90, at 95 ¶ 551. More specifically, Plaintiffs allege that "these contracts are virtually identical and were made expressly for the benefit of Plaintiffs and Class Members, as it was their Private Information that Zeroed-In agreed to receive and protect through its services," and therefore "the benefit of collection and protection of the Private Information belonging to Plaintiffs and Class Members was the direct and primary objective of the contracting parties." *Id.* ¶ 552.

The Court acknowledges that at this stage of the litigation, Plaintiffs do not have access to the contract terms between Dollar Tree and Zeroed-In. *See Ramirez v. Paradies Shops, LLC*, 69 F.4th 1213, 1220 (11th Cir. 2023) ("[D]ata breach cases present unique challenges for plaintiffs at the pleading stage. A plaintiff may know only what the company has disclosed in its notice of a data breach."). Thus, in determining whether Plaintiffs have plausibly pled that they are third-party beneficiaries to the contract between Zeroed-In and Dollar Tree, the Court cannot "look to the intention of the parties to recognize a person or class as a primary party in interest as expressed

in the language of the instrument." *CX Reinsurance Co. Ltd.*, 282 A.3d at 135. However, the Court can look to "consideration of the surrounding circumstances as reflecting upon the parties' intention." *Id.* Taking Plaintiffs' allegations as true, the Court finds it plausible that there are pertinent contract provisions that obligated Defendant to protect the sensitive data provided by Dollar Tree, and that those provisions were inserted to directly benefit Plaintiffs. Indeed, it is reasonable to infer that the contract would have contained such a clause given that Dollar Tree required the provision of Plaintiffs' PII as a condition of employment. ECF 90, at 81 ¶ 469. A more developed record, and the disclosure of the contract terms, may reveal otherwise; however, given the information imbalance pre-discovery and the nature of the personal information Dollar Tree provided to Zeroed-In, the Court finds Plaintiffs have plausibly alleged breach of a third-party beneficiary contract. *See, e.g., Stasi*, 501 F. Supp. 3d at 920 ("Plaintiffs' allegations that contracts exist that contain terms protecting their information are sufficient to allege a breach of contract claim based on a third-party beneficiary theory.").

### 3. Unjust Enrichment

In Maryland, "[a] claim of unjust enrichment is established when: (1) the plaintiff confers a benefit upon the defendant; (2) the defendant knows or appreciates the benefit; and (3) the defendant's acceptance or retention of the benefit under the circumstances is such that it would be inequitable to allow the defendant to retain the benefit without the paying of value in return." *Macsherry v. Sparrows Point, LLC*, Civ. No. ELH-15-22, 2017 WL 3315262, at *27 (D. Md. Aug. 3, 2017) (citing *Benson v. State*, 887 A.2d 525, 546 (Md. 2005) (citation omitted). Where "[t]here is no express contract" between Plaintiffs and Defendant, "courts have concluded that the failure to secure a party's data can give rise to an unjust enrichment claim where a defendant accepts the benefits accompanying plaintiff's data and does so at the plaintiff's expense by not implementing

adequate safeguards, thereby making it 'inequitable and unconscionable' to permit defendant to retain the benefit of the data (and any benefits received therefrom), while leaving the plaintiff [] to live with the consequences." *In re Capital One Consumer Data Security Breach Litig.*, 488 F. Supp. 3d 374, 412 (E.D. Va. Sept. 18, 2020) (citations omitted).

Here, Defendant allegedly accepted the benefits accompanying Plaintiffs' data without implementing adequate safeguards to protect Plaintiffs' PII. *See* ECF 90, at 98–99 ¶ 571 ("Zeroed-In profited from Plaintiffs' retained data and used Plaintiffs' and Class Members' PII for business purposes."). Defendant thus retained Plaintiffs' data, and the accompanying benefit, at Plaintiffs' expense. *See id.* at 99 ¶ 572; *see also In re Capital One*, 488 F. Supp. 3d at 413 (declining to dismiss plaintiffs' unjust enrichment claim because "[r]etaining the[] profits without adequately securing the data would be 'unjust.'"); *see also Capiau*, 2024 WL 3747191, at *12 (finding claim for unjust enrichment sufficient to survive motion to dismiss where "[d]efendant allegedly accepted the benefits accompanying [p]laintiff's data without implementing adequate safeguards to protect [p]laintiff's PII"). Plaintiffs also allege that "[i]f Plaintiffs and Class Members had known Zeroed-In would not use adequate data security practices, procedures, and protocols to adequately monitor, supervise, and secure their PII, they would not have agreed to the entrustment of their PII to Zeroed-In through its clients, including Dollar Tree." ECF 90, at 99 ¶ 574. Accordingly, Plaintiffs have adequately pled an unjust enrichment claim to survive Defendant's 12(b)(6) motion.

### 4.    Breach of Fiduciary Duty

Defendant contends that "Plaintiffs fail to identify the source of the fiduciary relationship between Plaintiffs and Zeroed-In—there is no statute on point, any contractual relationship is between Dollar Tree and Zeroed-In, not Plaintiffs, and there is no applicable common law fiduciary

relationship." ECF 96-1, at 34. By their failure to respond to this argument, Plaintiffs have abandoned any breach of fiduciary duty claim. *See Ferdinand-Davenport v. Child's Guild*, 742 F. Supp. 2d 772, 777 (D. Md. Oct. 6, 2010) (finding plaintiff's failure to respond to an argument constituted abandonment of claim); *Mentch v. E. Savings Bank, FSB*, 949 F. Supp. 1236, 1247 (D. Md. 1997) ("[Plaintiff] abandoned her [] claim by failing to address that claim in her opposition to [defendant's] motion for summary judgment, or to offer clarification in response to [defendant's] reply brief.").

Even if Plaintiffs had not abandoned this claim, dismissal would be appropriate because, as Defendant points out, "[f]or a fiduciary duty to exist, there must first be a fiduciary relationship," and Plaintiffs "fail to identify the source of the fiduciary relationship." ECF 96-1, at 34; *see Giddens v. CorePartners, Inc.*, Civ. No. JKB-10-3357, 2011 WL 2934855, at *5 (D. Md. July 18, 2011) (explaining that "a cause of action for breach of fiduciary duty may proceed when a plaintiff identifies the appropriate fiduciary relationship, such as principal and agent or trustee and beneficiary, identifies how the relationship was breached, considers the available remedies, and selects the remedies appropriate to the plaintiff's problem"). In the Complaint, Plaintiffs contend that "Zeroed-In became a fiduciary, created by its undertaking and guardianship of Plaintiffs' and Class Members' PII, to act primarily for their benefit." ECF 90, at 102. However, this type of "guardian of personal information," without more, is "not the type of relationship that historically has been considered fiduciary in character." *In re Premera Blue Cross Customer Data Security Breach Litig.*, 198 F. Supp. 3d 1183, 1203 (D. Or. 2016). The remaining allegations in the Complaint are conclusory and fail to establish that there was a fiduciary relationship, which is necessary for a fiduciary duty to exist. Accordingly, the Court dismisses Plaintiffs' breach of fiduciary duty claim.

### 5.  California Consumer Privacy Act

Plaintiff Jack Meyers asserts a claim on behalf of himself and the putative California Class, under the California Consumer Privacy Act ("CCPA"). ECF 90, at 106. Defendant argues that "Plaintiffs have alleged no conduct on behalf of Zeroed-In occurring in California." ECF 102, at 18 (emphasis removed). According to Defendant, "[t]he only purported nexus to California is that Plaintiff Meyers is a resident of California, but that is insufficient." *Id.* Plaintiff contends that "Plaintiff Meyers is a California resident and citizen, who received his Notice letter at a California address, and who seeks to represent a California Class of similarly situated persons," ECF 99, at 33 (citations omitted), and thus "is entitled to the protections of California law, regardless of where Zeroed-In is headquartered." *Id.* at 33–34. According to Plaintiffs, "[t]he conduct leading to the Data Breach impacting Plaintiff Meyers—the collection of Plaintiff Meyers's PII in connection with his employment at Dollar Tree—happened wholly within California as Plaintiff Meyers's employment at Dollar Tree should be presumed to have happened in California based on his being a citizen and resident of that state." *Id.* at 34.

California law presumes that the legislature "did not intend the statutes of th[e] state to have force or operation beyond the boundaries of the state." *Norwest Mortg., Inc. v. Superior Ct.*, 85 Cal. Rptr. 2d 18, 23 (Cal. App. 4th Dist. 1999) (citation omitted). Unless the legislature explicitly indicates otherwise, "if the liability-creating conduct occurs outside of California, California law generally should not govern that conduct[.]" *Oman v. Delta Air Lines, Inc.*, 889 F.3d 1075, 1079 (9th Cir. 2018).

Plaintiffs argue that "[i]n *Oman*, the Ninth Circuit held that California law applied to claims of California-resident employees, who received payment and worked primarily in California, just as is the case here." ECF 99, at 34. However, Plaintiff Meyers does not allege in the Complaint

that he received payment or worked primarily in California. The only connection to California in the Complaint is that "Plaintiff Jack Meyers is an adult individual and a natural person of California, residing in Sacramento County, where he intends to stay." ECF 90, at 12 ¶ 80. In the response in opposition to the Motion, Plaintiffs argue that Meyers "received his Notice letter at a California address," but the cited portion of the Complaint, *id.* ¶ 82, does not say anything about California. Rather, the Complaint merely states: "Plaintiff Meyers received a notice letter from Defendant Zeroed-In, dated November 27, 2023, informing him of the Data Breach and the unauthorized exposure of his Private Information." *Id.* And while Plaintiff Meyers asks this Court to "presume[]" that his employment happened in California "based on his being a citizen and resident of that state," the Court declines to do so because it is Plaintiffs' burden to allege sufficient facts demonstrating a nexus to California. For the same reasons, the Court also declines to presume that "the collection of Plaintiff Meyers' PII in connection with his employment at Dollar Tree []happened wholly within California," as Plaintiff Meyers urges, because such an allegation is found only in the response in opposition to the Motion, not in the Complaint. Additionally, the Complaint alleges that Defendant is "a Florida registered limited liability company with a principal place of business located at 780 Elkridge Landing Road, Suite 208, Linthicum, Maryland." ECF 90, at 16 ¶ 109. And Plaintiffs do not appear to contest that the "liability-creating conduct," namely, the Data Breach, occurred outside of California. *Oman*, 889 F.3d at 1079. Accordingly, there are insufficient facts in the Complaint to satisfy the presumption against extraterritoriality. The Court dismisses Plaintiff Meyers's claim on behalf of the putative California class under the CCPA without prejudice.

6.    Declaratory and Injunctive Relief

Under the Declaratory Judgment Act, federal courts have discretion to hear an action requesting declaratory judgment. 28 U.S.C. § 2201(a). The Fourth Circuit has held that "district courts have great latitude in determining whether to assert jurisdiction over declaratory judgment actions." *Aetna Cas. & Sur. Co. v. Ind-Com Elec. Co.*, 139 F.3d 419, 422 (4th Cir. 1998); *see also Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995). However, "[w]hen declaratory relief would be duplicative of claims already alleged, dismissal is warranted." *Chevron U.S.C., Inc. v. Apex Oil Co., Inc.*, 113 F. Supp. 3d 807, 824 (D. Md. 2015) (quoting *Sharma v. OneWest Bank, FSB*, Civ. No. DKC 11-0834, 2011 WL 5167762, at *6 (D. Md. Oct. 28, 2011)); *see also Geist v. Hispanic Info. & Telecomm. Network, Inc.*, Civ. No. PX-16-3630, 2018 WL 1169084, at *7 (D. Md. 2018) ("[W]here the same conduct underlies claims for declaratory judgment and breach of contract, 'courts generally dismiss the declaratory judgment claim as duplicative in favor of 'the better or more effective remedy' of 'the underlying litigation itself.'" (quoting *Dorset Indus., Inc. v. Unified Grocers, Inc.*, 893 F. Supp. 2d 395, 403 (E.D.N.Y. 2012))).

Plaintiffs maintain that their PII in Defendant's possession and control "remains at risk of future data breaches," and thus they are "entitled to seek declaratory and injunctive relief requiring Zeroed-In to implement proper data security measures consistent with applicable law and industry standards, enforcement of which falls within this Court's purview." ECF 99, at 37. Defendant responds that "Plaintiffs' allegations in their other causes of action demonstrate the duplicative and unnecessary nature of their Declaratory Judgment claim." ECF 102, at 20.

Plaintiffs plead a separate claim under the Declaratory Judgment Act in addition to requests for injunctive relief in their claims for negligence, breach of third-party beneficiary contract, and violation of the California Consumer Privacy Act. ECF 90 ¶¶ 501, 557, 621. Thus, Plaintiffs'

requested relief in Count XII mirrors the requested relief in other causes of action. The Declaratory Judgment count therefore "serves no purpose other than to reiterate the injunctive relief requested in [Plaintiffs'] other counts, as it is based on the same alleged breach of duty and harm stated in the other counts." *Burger*, 2024 WL 473735, at *9. "This type of double pleading is not the purpose of a declaratory judgment." *Penn Mut. Life Ins. Co. v. Berck*, Civ. No. DKC-09-0578, 2010 WL 3294305, at *3 (D. Md. Aug. 20, 2010) (citing *Aetna Cas. & Sur. Co. v. Quarles*, 92 F.2d 321, 325 (4th Cir. 1937)); *see also Hanback v. DRHI, Inc.*, 647 F. App'x 207, 210 (4th Cir. 2016) ("[T]he Declaratory Judgment Act is only 'procedural' and does not create 'substantive rights.'" (quoting *Medtronic, Inc. v. Mirowski Fam. Ventures, LLC*, 571 U.S. 191, 199 (2014))). Accordingly, Plaintiffs' independent claim for declaratory and injunctive relief in Count XII is dismissed. *See Simone v. VSL Pharm., Inc.*, Civ. No. TDC-15-1356, 2017 WL 66323, at *10 (D. Md. Jan. 5, 2017) ("Where . . . injunctive relief is included in the request for relief, there is no reason to allow these duplicative requests to proceed in the improper guise of independent causes of action."). However, this ruling is without prejudice and Plaintiffs are free to pursue declaratory and injunctive relief as remedies.

## IV.    **CONCLUSION**

For the foregoing reasons, Defendant's Motion, ECF 96, is **GRANTED** in part and **DENIED** in part.

A separate implementing Order will issue.

Dated: <u>March 26, 2025</u>                                 <u>     /s/     </u>
                                                         Brendan A. Hurson
                                                         United States District Judge